Sylvester SMITH, Respondent,

v.

The ESTATE of Lydia SYPRET, Appellant.

No. 52311.

Supreme Court of Missouri,
Division No. 1.

Nov. 13, 1967.

Thurman, Nixon, Smith & Howald, Jeremiah Nixon and James E. Bowles, Hillsboro, for respondent.

Carl E. Starkloff, Clayton, for appellant.

HIGGINS, Commissioner.

Claim for services filed in the Probate Court of Jefferson County and certified to the circuit court, Section 473.420, V.A.

M.S., where jury verdict and judgment were for plaintiff for $18,000.

Lydia Sypret, an elderly lady of undetermined age, residing in Festus, Missouri, died intestate and Beulah Evans, a niece of deceased, upon her application for letters of administration, was appointed administratrix of the estate of Lydia Sypret. The application averred under oath that Mrs. Sypret died September 13, 1964, and that the surviving relatives, in addition to Mrs. Evans, were other nieces and nephews or grandnieces and grandnephews. Plaintiff was not shown to be related by blood or marriage to deceased.

Plaintiff's claim in quantum meruit was filed March 18, 1965, by which he sought the reasonable value of services allegedly rendered Lydia Sypret during her lifetime. Such services were described as: "1940–48—General services assisting deceased around the house, including general maintenance, running errands, general handiwork * * *. 1948–1960—More extensive services of the above type, in addition, painting, laying linoleum, repairing wiring, cutting grass, triming (sic) trees, yard work and general repairs, cleaning, spraying, paying deceased's bills for her, shopping, transporting her around, both for personal and business, and to the doctors and hospital, caring for her when sick, reading mail, cleaning, looking out for her well being by regular visits and calls, repairing plumbing, and generally personally caring for deceased * * *. 1960 to September 1964 * * * All of the above plus extensive personal care made more necessary by additional frailities (sic) and illnesses * * *."

Sylvester Smith identified himself as the plaintiff. He was prevented from further testimony upon objection based upon the Dead Man's Statute, Section 491.100, V.A. M.S.

Alta Cason had known plaintiff about fifteen or twenty years and Mrs. Sypret about ten years. She last saw Mrs. Sypret "at the hospital and at the funeral." Her situation in the last year of her life was "very poor. * * * She was alone and she had gotten to the place where she couldn't see and this we know, because Sylvester had taken her to the doctor * * *." She had conversations with Mrs. Sypret where Sylvester Smith was discussed "almost daily, I mean there wasn't hardly a day passed that she didn't say something about him and how she couldn't make it without him and that he was the only one that she could rely on, really, and she told me that he was just the only thing that she had left and that, you know, she was very appreciative of it, very thankful, and that one day he would be rewarded for all of this." Mrs. Sypret told her of a conversation with Sylvester Smith in 1948. " * * * she said that after her husband had passed that she had asked Sylvester if he would be responsible for the keeping up * * * if he would see after the house in general, you know, do things for her such as the maintenance work, cleaning the yard, fixing light sockets, and he painted the house inside, layed (sic) linoleum, painted the house outside, just general work that a man would do around a house, that whatever she had then would become his, 'cause as I said, she told me she thought Sylvester was the only relative she had after Edith's passing." As to what was done before the witness knew Mrs. Sypret, "She said, he's around the house to do things for her, he took her back and forth to the doctor, to the hospital, general, just everything. * * * Personally I've seen him helping cut the grass, personally we layed (sic) linoleum together, we fixed a light switch together, we've carried her to the hospital, also to DeSoto to Dr. Mueller, to the eye doctor, * * * to the clinic here in Hillsboro, backwards and forwards to Barnes and visiting her back and forwards and many Sunday afternoons and just during the week days when Sylvester was off just take her out joy riding." It was Mr. Smith's automobile that was used to trans-

port Mrs. Sypret. She saw no one but Sylvester work at maintaining the house and yard unless "he'd be working and he'd hire a child to go up and cut the grass for him." Cross-examination showed that Mrs. Cason had been separated from her husband for seventeen years and did not know his whereabouts. She lived in the same apartment house in which plaintiff lived, sharing a common kitchen. She had an unadjudicated claim against the estate for $3,150 for similar services as did several other persons in the neighborhood. "I'm not saying maybe that others didn't do some, one or two things too, but she knew Sylvester would be the one that whatever she needed, whatever hour it was 'cause I seen him take off from work to do things for her." Mrs. Sypret told her that plaintiff had refused to accept money, "she said, I tried to pay him and he wouldn't take it and for this reason he would be well rewarded." He made no demand for payment during Mrs. Sypret's lifetime.

Wyatt Beckett saw Sylvester Smith at Mrs. Sypret's home on more than one occasion. " * * * one time he was painting the house, I believe, on the inside or something on the inside." That was "probably four or five years, I think, ago I seen him there but he'd been there many times though, before that. * * * I seen him there watering the flowers or something there one day but I've seen him there working around. * * * he's been going around there for the last 30 years I know * * *." He had never seen any other man helping around the Sypret place. He also took her places in his automobile. " * * * she said he helped out, she didn't know what she'd do if he (Sylvester) didn't come see about her."

May Eva Barnes also saw Sylvester Smith at Mrs. Sypret's place. "He'd be cleaning the yard, cutting the lawn, or taking her to the store or to the doctor or to the clinic." She observed these things for 20 or 25 years. She had seen plaintiff painting inside Mrs. Sypret's house.

Mr. Smith never lived in Mrs. Sypret's home and always slept away from there. Mrs. Sypret told her, "without him she didn't know what she'd do 'cause she didn't have anybody else to depend on but him."

Wallace Rosener lived near Mrs. Sypret for eighteen years prior to 1950. He saw Sylvester Smith at the Sypret place doing "what you do around the yard, work in the flowers, the grass, mending a little stuff around, working on the fences, sheds. * * * I'd see him going in and out. * * * He was over there every week and a lot of times practically every other day." He would go there "after he got off from work, a lot of times if he was on the evening shift he'd do it in the morning, if he was evenings he'd have to do it in the mornings, if he's working days it would be late in the evening before he could get over there." He observed plaintiff working around the yard and cutting grass.

Mrs. Wallace Rosener also saw plaintiff at Mrs. Sypret's doing "usually just what a man would do around the house, grass cutting, mending the fence, repairs had to be done. * * * I've seen him go over there and visit Mrs. Sypret." She saw him painting on the inside of the house.

Richard L. Cook, Sr., had seen Sylvester Smith at the Sypret place. " * * * he cuts grass, mends the fence, goes in and out all the time, I don't know what he'd do inside but sometimes he'd bring food up there." He saw Mr. Smith painting the porch and saw him with Mrs. Sypret in his car "quite a few times." He watched Mr. Smith care for Mrs. Sypret's needs for thirty-two years. Mr. Cook also had cut grass and pulled weeds for which Mrs. Sypret offered to pay him.

Doris Cook observed plaintiff at Mrs. Sypret's "working in the yard or either taking her shopping or something. * * * he was there all the time, and when she got real sick he was there every day."

She saw no other man work around Mrs. Sypret's place.

Mrs. Carl Casey saw Mr. Smith doing "general yard work and general work around the house, such as a man would do * * * 20 years." She saw him drive Mrs. Sypret in his car many times. " * * a lot of times I've seen them come back with groceries, like you have when you go shopping." She saw no other man work there. "I seen him (Sylvester) there almost every day, if it wasn't in the morning it would be in the afternoon." He did not live at Mrs. Sypret's.

Lavella Keaton, a cousin of Mrs. Sypret, lived across the street from Mrs. Sypret for about twenty-two years. She saw Sylvester there. " * * * he would work in the yard, or he would work in the house, anything needed doing in the house, any kind of repair work or anything and he'd take her shopping and he took her to the doctor bring her out here to Court and different things like that." She saw no one else helping "unless some boy would be there cutting the grass, probably he'd sent someone, if he couldn't do it, he'd sent someone." She saw him take Mrs. Sypret in his car. " * * * he'd take her to the doctor, he took her to the clinic, he took her shopping and when he couldn't, when she couldn't go, why he would go shopping himself for her." She saw him "painting around the woodwork or something like that. * * * he was there practically every day if he could get there." He did not live or sleep there. Mrs. Keaton also had a claim for services. She was aware that Mrs. Sypret referred to plaintiff as a nephew. " * * * she didn't know what she'd do if it was (not) for him and said that he would be rewarded for it."

Elvoid L. Keaton saw plaintiff "doing work like any man would do around a home." He saw him painting, working inside the house, and taking Mrs. Sypret in his automobile.

Ernest C. Keaton went to Mrs. Sypret's "to shut the water off for her. On one occasion I gave him (Sylvester) some tools to repair the line with. * * * He spliced a piece of pipe into another piece of pipe. * * * it was in the bathroom, but it was underneath the floor." He saw Sylvester there quite often, usually on the outside, and taking Mrs. Sypret in his car.

Mrs. Pearlie Barnes observed plaintiff taking Mrs. Sypret in his car and going back and forth regularly. Pearlie Barnes made similar observations for about seventeen years.

Sarah Beckett lived near Mrs. Sypret for ten years and saw plaintiff there "cutting the grass, taking Mrs. Sypret to the hospital, to the doctor and doing her trading for her." She, too, was aware that Mrs. Sypret thought of plaintiff as a nephew.

Mattie Keaton had known Sylvester Smith since he was a child. She saw him at Mrs. Sypret's all the time. " * * * he'd be cleaning the yard, working around the porches, taking care of the flowers mostly anything that needed being done." She also saw him taking Mrs. Sypret in the car. He would be there "about every day, every other day. * * * When the house began to get bad, he was there, often, off and on twenty years he's been taking care of her."

Lucy Akins, aged 72, had known Mrs. Sypret "ever since she had been in Festus." She knew that Sylvester Smith went to Mrs. Sypret's "whenever she called him." She also saw him taking her in his car. Although she had understood Sylvester to be a nephew of Mrs. Sypret she had now learned there was no blood relationship between them.

Mrs. Sherman Barnes had seen plaintiff in Mrs. Sypret's yard and taking her in his automobile.

Dr. Bertalan Bolgar stated that whenever he treated Mrs. Sypret, Sylvester Smith brought her to the office. According to him, Mrs. Sypret told him "that Sylvester Smith was her cousin and that he looked after her."

Defendant's motion for a directed verdict at the close of plaintiff's case was overruled after which defendant adduced testimony from the defendant administratrix, Beulah Evans. She testified that she was a niece of Mrs. Sypret and identified the surviving relatives of Mrs. Sypret, which class did not include Sylvester Smith. At the conclusion of defendant's case, defendant again moved for a directed verdict which was denied.

■ Appellant questions the submissibility of plaintiff's case in that points I and II charge the court with error in refusing to direct a verdict for defendant at the close of plaintiff's case and at the close of all the evidence. Specifically, "appellant takes the position that the plaintiff did not make a submissible case * * for the reason that * * * (he) did not prove that there was an intention to pay and an intention to charge but rather there was an expectation to be rewarded in the future as an heir." Appellant would support this position by 34 C.J.S. Executors and Administrators § 370b, p. 103, "Compensation is not allowable for services performed gratuitously, even though the claimant entertained a hope of receiving a gift or legacy or acted under an erroneous belief, not induced by fraud, as to the financial condition of decedent"; and by 34 C.J.S. Executors and Administrators § 371, p. 108, "Decedent's mere expressions of gratitude, or of a desire to compensate (persons in family relation) in the future fall short of establishing a contract for payment."

■ Under the foregoing evidence, plaintiff's case was justifiably submitted by the quantum meruit instruction on his theory that "absent a family relationship,

where one performs valuable services for another, the benefit of which has been received and enjoyed by him, the law presumes an intention on the part of the former to charge and the latter to pay the reasonable value thereof and implies a promise on the part of the one receiving the services to pay a reasonable value for said services." Embry v. Martz' Estate, Mo., 377 S.W.2d 367, 368; Ridinger v. Harbert, Mo.App., 409 S.W.2d 764, 767 [1]. Cf. Wood v. Lewis' Estate, 183 Mo.App. 553, 167 S.W. 666, 668.

■ It is obvious plaintiff was not in a family relationship with Lydia Sypret because "to constitute a 'family' there must be (1) a social status, (2) there must be a head who has a right, at least in a limited way, to direct and control those gathered into the household, and (3) this head must be obligated either legally or morally to support the other members, and (4) there must be a corresponding state of at least partial dependence of the other members for this support." Embry v. Martz' Estate, supra, 377 S.W.2d 1. c. 370 [1]. See also Steva v. Steva, Mo., 332 S.W.2d 924, 926–927 [3–6]. None of these elements were shown by the evidence and, in addition, plaintiff and Mrs. Sypret lived in separate homes and there was no relation by blood or marriage, factors which would bear on such a relationship. Ridinger v. Harbert, supra, 409 S.W.2d 1. c. 767 [1].

■ Defendant neither pleaded nor proved the affirmative defense of a family relationship, a matter upon which defendant would have the burden of proof, Muench v. South Side National Bank, Mo., 251 S.W.2d 1, 4 [6]; and where there is no family relationship, the intent to charge and agreement to pay are presumed and the burden is on the resisting party to prove otherwise. Thomas v. Fitzgerald's Estate, Mo.App., 297 S.W. 425, 428 [2, 3]. There was an opinion by witness Cason on cross-examination that plaintiff rendered his services out of love and affection, but such

was not an admission of, nor binding on plaintiff, and did not compel a directed verdict against plaintiff.

■ In point III error is charged in the refusal of Instruction No. A: "If the jury believe that the claimant believed that he was a blood relative of the deceased, he cannot receive a verdict * * * unless claimant has proved an express contract between himself and the deceased for the performance of and payment for services rendered the deceased."

This instruction was properly refused because, as previously demonstrated, the only way that defendant can cast the burden of proving an express contract on plaintiff is by proving a family relationship, as defined in Embry v. Martz' Estate, supra, and Steva v. Steva, supra, and kinship, actual or assumed, is "not necessarily essential to the establishment of a family relation." Wells v. Goff, 361 Mo. 1188, 239 S.W.2d 301, 304 [5].

■ Appellant's point IV is a charge of error in refusing Instruction No. B: "Your verdict must be for the defendant if you believe: That the claimant performed services for the deceased upon the belief or in anticipation of being granted a bequest or a legacy from the estate of the deceased, even if you believe that the deceased stated that she would do so."

This would also misstate the applicable law. It is true that where family relationship exists, a plaintiff may not prove the required contract to compensate by a showing that deceased intended to bestow a bounty unless he shows further that such was the agreement and the manner in which the agreement was to be fulfilled. Trantham v. Gullic, Mo.App., 201 S.W.2d 522, 527. In this case, however, where no family relationship is shown, plaintiff need not show when he intended to be paid because once he shows services rendered by him to deceased and accepted by deceased, the law implies the contract for compensation, Embry v. Martz' Estate, supra, and the burden is on defendant to show the services were rendered gratuitously, Thomas v. Fitzgerald, supra. Instruction No. 4 amply covered this aspect of the submission by directing a verdict for defendant if the jury believed "That the claimant did not intend to charge the deceased * * * even though you believe that she offered to or was willing to pay * * *."

■ By Points V and VI, appellant complains of error in giving Instructions 2 and 3. These instructions are nearly identical to and of the same substance as Instructions 3 and 4 set forth and found free of error in Ridinger v. Harbert, supra, 409 S.W.2d 1. c. 768 [6].

■ Additionally, appellant argues that a directed verdict was required "for the reason that there is no proof whatsoever in the record as to the value of any services performed." The services proved to have been rendered by plaintiff, home maintenance, repairs, yard work, driving, nursing, personal care, etc., are of a nature, the reasonable value of which is within the common knowledge of the court and jury, and where such common knowledge exists, "proof of the reasonable value is not essential to a recovery in quantum meruit. * * * 'The members of a jury may be presumed to know the value of the services of a nurse or common laborer.'" Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875, 881 [10].

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.