**Ella SCHANZ, Plaintiff-Appellant,**

v.

**The ESTATE of Weaver S. TERRY, Deceased, Defendant-Respondent.**

**No. 35109.**

Missouri Court of Appeals, St. Louis District.

Jan. 3, 1974.

---

Pannell, Dodson & Robinson, Festus, for plaintiff-appellant.

Herder & Kearns, St. Louis, for defendant-respondent.

GUNN, Judge.

Claim in quantum meruit filed by plaintiff-appellant Ella Schanz against the estate of Weaver S. Terry, defendant-respondent, in the Jefferson County Probate Court for services rendered by plaintiff to Weaver S. Terry during his lifetime. The case was certified to the circuit court for trial pursuant to § 473.420 RSMo 1969, V. A.M.S.

Ella Schanz, who at the time of trial was 59 years old, commenced working at the age of 13 on the farm of Lee and Minerva Terry, Weaver Terry's mother and father, in Danby, Missouri. Minerva Terry had back infirmities and wanted someone to do household chores for her. Ella traveled between her home and the Terrys' farm in Danby until 1931 when she was 18, at which time she moved into the Terry residence and continued with her chores. Lee Terry died in 1940 and Minerva Terry died in 1949. Ella's claim for services dates from the time of Lee Terry's death in 1940 to the date of Weaver's death in 1969, a period of 25 years.

Ella's capacity for work was enormous. The farm lacked modern conveniences, and Ella chopped the wood for the woodburning stove, fetched the water in heavy buckets from the nearest spring a quarter of a mile from the house, loaded, unloaded and carried 50 to 75 pound sacks of feed for livestock, fed the livestock, rounded up the livestock when they escaped, worked in the fields, washed and ironed the clothing, cooked the meals, washed the dishes, mended the fences and drove the tractor. Since Weaver did not drive, Ella was required to do all the running of errands and to chauffeur Weaver whenever he wanted to go anywhere. In fact, except for some minor assistance from Weaver in mending fences, Ella did all the work around the farm. Two or three times a year the access road to the farm would become inundated with water and a lake would form over the road leaving the only means of travel between the farm and the main roads by walking about a mile and a half over a rough trail or by the use of a longboat over the lake. Weaver did not like to walk, so Ella would row him by boat across the tarn.

In addition to her workload, Ella worked outside the farm as a cook at various times for a factory cafeteria, a nursing home and for local restaurants. The outside work necessitated her leaving the farm about 4:30 a. m. and returning home in middle afternoon to perform her farm duties. Ella's money was used for paying farm expenses. Weaver's penchant for work was minimal, although he had no physical disability except for the loss of sight in one eye. Weaver's relatives and friends testified on Ella's behalf and verified Weaver's slothfulness.

It was stipulated that no marriage ceremony ever took place between Weaver and Ella; that there was no blood relationship between the two. Friends and relatives testified that they thought of Ella as being part of the Terry family, but there was also testimony which characterized her as more of a servant. Weaver's parents preferred that Ella be called Ella Terry rather than Ella Schanz, as Mr. Terry did not like the name Schanz. Some letters were addressed to Weaver and Ella as "Weaver and Ella Terry", and there was also evidence that from time to time Ella referred

to herself as Ella Terry. Part of defendant's theory of the case was that Ella and Weaver were husband and wife for all practical purposes, but no one ever saw any sexual activity or a display of affection toward each other.

There was no evidence whatsoever that Weaver and Ella ever shared the same bed; to the contrary they maintained separate sleeping facilities.[1] Whenever asked, Ella always denied being married to Weaver and it was her belief that her relationship with Weaver was as an employee although she felt like a daughter to his parents and they treated her with kindness. She testified she considered Weaver only as a friend. Ella and the Terrys would participate in many of the family social gatherings, and when time permitted, Ella would go fishing with Weaver for relaxation. Ella testified that she did not expect to get paid for her services at the time she rendered them, because Weaver did not have any money to pay her but that from time to time either Weaver or the Terrys indicated that they would "take care of her for all she had done."

The jury returned a verdict of $58,000 in favor of Ella, but the trial judge sustained defendant's motion for directed verdict on the grounds that Ella was barred from recovery on quantum meruit as a matter of law by reason of her family relationship with Weaver Terry. We find in this case that whether a family relationship existed is a factual issue and, therefore, we reverse the judgment of the trial court and remand with instructions to reinstate the verdict. The amount of the jury award was not contested, so that point is not at issue.

Judge Weier in speaking for this court in Griffith v. Estate of Winebarger, 471 S.W.2d 941 (Mo.App.1971), referred to Jaycox v. Brune, 434 S.W.2d 539 (Mo. 1968), and Smith v. Estate of Sypret, 421 S.W.2d 9 (Mo.1967), as the primers on claims for quantum meruit for personal services against estates and to the effect or presence of a family relationship. We also rely on those decisions in setting forth the applicable law in this case.

■ Where no family relationship exists and a valuable service is performed by one person for another, there is a presumption of an implied promise by the recipient of the services to pay the reasonable value of such services, and the amount of payment may be recovered in quantum meruit. The defense of a family relationship is an affirmative defense, and the defendant has the burden of proving that a family relationship does exist. Therefore, the questions to be determined here are: what is a family relationship and did such a relationship exist between Ella and Weaver?

■ To constitute a relationship, there must be (1) a social status, (2) a head of the family who has a right, at least in a limited way, to direct and control those gathered in the household, (3) the head of the family must be obligated either legally or morally to support the other members, and, (4) there must be a corresponding state of at least partial dependence of the other members for this support.

■■ Defendant argues that as a matter of law, Ella's and Weaver's relationship was that of a family implying that her work was done gratuitously. Defendant cites from the record that Ella had said she felt she was a part of the Terry family; that she did not expect to get paid for working for Weaver at the time she was doing her work; that her social and leisure life was spent with Weaver; that she permitted herself to be referred to as "Ella Terry" and had signed her name that way; that Weaver had shown concern for her health when she became ill and urged her

---

1. Witnesses who spent the night on occasion in the Terry farm noted that Ella and Weaver had their beds in separate rooms; that Weaver slept with a dog or two and "when it got cold he would throw on a couple of more dogs." There were some five dog nights in the bitterness of the Danby winters.

to see a doctor and be hospitalized.[2] Ella counters that she felt more like a friend to Weaver; had no marital relationship with Weaver; witnesses testified that she seemed more like a servant or hired hand; that the reason that she did not expect to get paid as she was doing the work was that there was no money at that time to pay her; that there was evidence that both Weaver and his parents had stated that they would "take care" of Ella for all the work she had done;[3] that there was an absence of evidence to establish a showing that Weaver directed or controlled Ella or that he gave her any support or that she was partially dependent upon him.

■ We find that the question whether a family relationship existed in this case is factual and for the jury to determine. It is not essential that there be kinship or meretricious cohabitation between an unmarried man and woman residing in the same dwelling to have a family relationship. But the relationship must be established by evidence before the presumption that services rendered were intended to be gratuitous. Where there is no family relationship, the services rendered are not presumed gratuitous, Morris v. Retz, 413 S. W.2d 544, 548 (Mo.App.1967), and under the evidence of this case the question of family relationship was for a jury. See Sevier v. Estate of Staples, 309 S.W.2d 706, 709 (Mo.App.1957).

Jaycox v. Brune, *supra,* fairly summarizes the recent cases on the question of family relationship and there the court said, 434 S.W.2d, l. c. 544:

"In the ordinary case both the existence of a family relationship and (if there be one), whether there was an agreement to pay or an understanding that the services would be paid for, are questions of fact. In nearly all of the cases such questions have been submitted to the jury."

So, too, do we believe that the question of the family relationship was properly submitted to the jury for their determination as to whether Ella should be entitled to recover under her theory of quantum meruit.

■ One other matter requires consideration. In its order sustaining defendant's motion for judgment, the trial court further provided that in the event its ruling was reversed on appeal, defendant's motion for a new trial was ordered sustained for the reason "that under the law, the pleadings and the evidence the verdict of the jury should have been in favor of defendant." We find that this latter order did not state a legal ground for a grant of a new trial. In McCarthy v. Halloran, 435 S.W.2d 339 (Mo.1968), it was held that an order granting a new trial because the verdict "was against the law and the evidence" set forth no legal ground and was therefore meaningless; that the court could not construe the wording of the order to embrace the basis of the order as being against the weight of the evidence, since the latter ground was specifically alleged but not adopted or sustained. We find the decision of McCarthy v. Halloran, *supra,* appositive here.

The judgment of the trial court is reversed and remanded with instructions to reinstate the jury verdict in favor of Ella Schanz.

SMITH, P. J., and McMILLIAN, J., concur.

2. It is very well that Weaver should be concerned for her health, for without the indefatigable Ella, who would have done all of Weaver's work? Weaver had been accused of being indolent—not mentally obtuse.

3. Ella maintains that such statements clearly indicate that she did not intend to work gratuitously but expected eventually to get paid; that the statements further establish the absence of a family relationship. She emphasizes that the statements do not displace her theory of recovery on quantum meruit by inferring express or implied contract, requiring proof of contract. We agree that the case was properly submitted on quantum meruit.