In the ESTATE OF William Lacy
DODSON, Deceased.

Rosemary MARTIN, Appellant,

v.

Mark DODSON and Stephen Dodson, Personal Representatives of the Estate of William Lacy Dodson, Deceased, Respondents.

No. 19198.

Missouri Court of Appeals,
Southern District,
Division Two.

June 27, 1994.

Jane B. Wyman, Spradling & Wyman, Carthage, for appellant.

Roger K. Fisher, Warten, Fisher, Lee and Brown, Joplin, for respondents.

CROW, Judge.

Claimant, Rosemary Martin, filed a claim against the Estate of William Lacy Dodson, Deceased, seeking $302,199.51. Claimant characterizes the claim as one in "quantum meruit for goods provided and services rendered" by her to William Lacy Dodson ("Decedent") from September 24, 1981, until he died April 7, 1993.

The claim was tried in the Probate Division of the Circuit Court of Jasper County ("the trial court") without a jury. The trial court entered extensive findings of fact and conclusions of law, and denied the claim. Claimant appeals.

One of the trial court's conclusions of law was that Claimant and Decedent lived together as a "family unit." The effect of that conclusion was that the following rules of law applied:

> "If a family relationship exists, there is a presumption that any services performed are rendered gratuitously even though the claimant entertained the hope of payment, unless the claimant can show by direct evidence, or evidence from which it may be reasonably inferred, that there was an agreement or mutual understanding the claimant was to be remunerated. *Jaycox v. Brune,* 434 S.W.2d 539, 544 (Mo.1968); *Estate of Sanders,* 719 S.W.2d 947, 949 (Mo.App.1986)."

*Osborne v. Boatmen's National Bank of Springfield,* 732 S.W.2d 242, 244[1] (Mo.App. S.D.1987).

> "Even if it is believed that [the claimant] 'expected' to be paid, there must be some evidence that decedent *intended* to pay her."

*Estate of Erickson,* 722 S.W.2d 330, 335 (Mo. App.W.D.1986) (emphasis in original).

The first of Claimant's two points relied on asserts the trial court erred in concluding that a family relationship existed between Claimant and Decedent. Claimant cites *Smith v. Estate of Sypret,* 421 S.W.2d 9, 14[3] (Mo.1967), which holds that to constitute a family: (1) there must be a social status, (2) there must be a head who has a right, at least in a limited way, to direct and control those gathered into the household, (3) the head must be obligated either legally or morally to support the other members, and (4) there must be a corresponding state of at least partial dependence of the other members for this support. Claimant maintains the evidence did not establish those elements.

■■■ As noted in *Osborne,* 732 S.W.2d at 245, our review is governed by Rule 73.01(c),[1] as construed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy,* 536 S.W.2d at 32[1]. Credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988). Accordingly, in determining the sufficiency of the evidence, we accept as true the evidence and inferences from it favorable to the judgment and disregard contrary evidence. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654[2] (Mo. banc 1989).

■■■ Decedent was in the dairy cattle business and had a dairy. He resided in a house near Reeds, Missouri. He never married and had no children.

Claimant, a career bank employee, had known Decedent almost all her life. She testified she and he began a "personal relationship" on September 24, 1981, the date her husband died. At that time, she resided and worked in Joplin. Claimant's testimony regarding her relationship with Decedent included this:

"Q. And during that period of time of September 24, 1981 to the date of his death, did you live with Mr. Dodson at least off and on?

A. Yes.

. . . .

Q. ... Would you describe what that relationship was please?

A. Personal relationship to me is loving and caring for each other.

. . . .

Q. Your personal relationship started on September 24th, 1981?

A. That's correct.

Q. That relationship continued in the same capacity up to the time of his death?

A. Caring, personal, yes."

Claimant sought recovery for a broad range of items, one of which consisted of payments by her for utility services to her places of residence throughout the entire period covered by the claim, September 24, 1981, to April 7, 1993. When the relationship began in 1981, Claimant resided in a house at Joplin. She moved to a different address in Joplin in 1984, and eventually to an apartment in Joplin on January 1, 1986. She maintained that apartment until Decedent died.

In support of her claim for the utility expense, Claimant testified:

"Q. ... Did Lacy live [at those addresses]?

A. Yes, he stayed with me some.

Q. And how often did he stay in ... those residences?

A. Oh, my, there again, too, he was over at least—almost five nights out of seven at any given time. That's one thing that was in here, especially on my cable that Lacy liked to watch. He always came in and had dinner, et cetera.

Q. Now, other than living there, did you use these three residences for any other purpose involving your relationship with Lacy?

1. Rule references are to Missouri Rules of Civil Procedure (1993).

A. Yes, I have.

Q. What were those other things?

A. It is due to cattle buyers coming in to be entertained and that at given times at these residences that I have entertained and cooked dinner there and helped with his business in this relationship with this.

Q. All right. These are cattle buyers, fellows that were involved with Lacy in his business?

A. Yes."

As we understand Claimant's testimony, as the years passed she and Decedent spent more time at his residence and less at hers. Nonetheless, she continued to maintain the apartment. Her testimony:

"Q. ... did Lacy insist that you have this [apartment]?

A. Yes.

Q. He did. Was that for the purposes of business or what?

A. For business.

Q. And did you entertain there?

A. Yes, sir.

. . . .

Q. And was that at Lacy's insistence or your own insistence?

A. Lacy's."

Claimant sought recovery for the rent she paid for the apartment from the first day of occupancy (January 1, 1986) until Decedent died.

Claimant also sought recovery for clothing she purchased for herself and Decedent, and for expenses incurred by her for "personal grooming." She explained: "I kept myself up for the cattle buyers and would be well presented when we went out to be with the customers and the buyers.... Lacy would want me to look very nice ... [s]o I would be an asset to the business in buying and selling cattle."

Additionally, Claimant sought recovery for amounts spent by her for automobile maintenance and repair, laundry and dry cleaning, groceries, household items, VCR tapes, meals in restaurants, flowers, gifts, liquor and postage. She also sought recovery for the value of labor performed by her in connection with Decedent's cattle business (she described her role in pulling calves), and for the value of her services in cooking, cleaning and entertaining for Decedent.

Asked why she incurred the expenses and performed the services, Claimant testified:

"Lacy had told me we would get married and have a home. I would benefit from all this by a marriage.

. . . .

Q. That's something he told you?

A. Yes, sir.

Q. And if you performed these services, that some day you would be married and you would benefit from it?

A. Correct.

. . . .

Q. Did you ever ask Lacy to reimburse you for any of those [expenses]?

A. Lacy and I had talked about whatever we did like this, yes, that we were going to be married and I would have benefited from all this.

. . . .

Q. My question was you did not ask him to reimburse you, that's what I understood your response to be? Yes or no?

A. No.

Q. You didn't anticipate getting reimbursed either, you never expected to be reimbursed?

A. Well, yes, yes, I did.

Q. And how did you expect to be reimbursed?

A. We planned to be married and I would have my benefits ... that's how it was.

Q. What benefits are you speaking of?

A. Marriage benefits.

. . . .

Q. Your sole idea of reimbursement then was that you would be married?

A. Lacy and I understood that, someday, we planned to."

Regarding element 1 of the test set forth in *Smith, supra,* for determining whether two or more people constitute a family, Claimant argues there was no evidence she and Decedent had a "social status." Claim-

ant points out she testified she never held herself out to be Decedent's wife.

However, Claimant also testified, "We were a couple." Claimant conceded: (a) she lived in Decedent's house; (b) she spent almost all her time with him except when she was working at the bank; (c) many people thought she and he were married; (d) they attended church, were involved in community activities, and traveled together.

Furthermore, viewing the evidence favorably to the trial court's judgment, it is inferable that in her role as hostess for Decedent in entertaining business associates, Claimant was not presented as an employee or hired caterer, but instead as a member of the household.

We hold the evidence is more than sufficient to establish element 1.

As to element 2 of the *Smith* test, Claimant maintains Decedent had no right to control her. Claimant reminds us she was employed and self-supporting throughout the relationship.

Element 2 was addressed in *Osborne*, which involved a claim by a woman against the estate of a man with whom she had engaged in a lengthy relationship and discussed marriage. The court said:

> "Decedent directed and controlled claimant's activities in the same limited way that most 'heads of households' do in our society: by asking and receiving claimant's cooperation in performing household duties, driving on trips and providing the comfort of her society."

732 S.W.2d at 245.

During her testimony, Claimant acknowledged Decedent could tell her "what to do and not to do." She explained, "Well, it was back to our kind of relationship of respecting each other and loving each other in this respect, and trust." Her testimony continued:

> "Q. Lacy was a very dominating person, wasn't he?
>
> A. Yes.
>
> . . . .
>
> Q. He dominated, he was the head of the household so to speak?

> A. Correct."

As noted earlier, Claimant kept the Joplin apartment at Decedent's insistence. One of its uses was entertaining Decedent's business associates. Additionally, Decedent used the telephone there for business calls.

Claimant also testified she accompanied Decedent on numerous trips to cattle sales, something she would have had no reason to do had she not been "involved" with Decedent.

The foregoing evidence demonstrates the kind of "control" discussed in the above-quoted passage from *Osborne*, i.e., by asking for and receiving another's cooperation and society. Measured by *Osborne*, the evidence here is sufficient to establish element 2.

As to elements 3 and 4 of the *Smith* test, Claimant testified, "I'd give Lacy money, he give me money, we helped each other at times." Claimant also testified: "[H]e bought some [groceries], I bought some. Percentage, I can't break that down...."

When Claimant and Decedent ate in restaurants, he paid for some meals and she paid for some. The relationship is illustrated by this excerpt from Claimant's testimony:

> "Q. When you lived with him, the two of you shared duties as a normal couple. He helped you with duties around the house and you did duties around the house such as cooking, cleaning the house, is that not true?
>
> A. That's true and I helped him.
>
> . . . .
>
> Q. You didn't really give it much thought as to whether he paid for something or you paid for ... something, you did things together?
>
> A. Well, sometimes I'd give it a thought yes.
>
> Q. And what times was that?
>
> A. Well, maybe doing something—in a jokely [sic] matter, I can remember things, say you pay for it, and I said no, I think you better take it this time."

The evidence discussed above is comparable to the evidence in *Osborne* which was held sufficient to support a finding that a

family relationship existed there. We hold the evidence is sufficient to establish elements 3 and 4.

There was no evidence that during the eleven-year relationship, Claimant or Decedent ever consorted with anyone else. Their relationship had all of the characteristics of a marriage except a marriage license and ceremony. The trial court did not err in concluding Claimant and Decedent created a "family unit" as defined by *Smith*. Claimant's first point is denied.

■ Claimant's second point avers the trial court erred in failing to grant her claim in that Decedent's personal representatives ("Respondents") "neither pleaded nor proved the affirmative defense of a family relationship."

Claimant cites *Muench v. South Side National Bank*, 251 S.W.2d 1, 4[6] (Mo.1952), which states that where a decedent's estate resists a claim for services rendered to the decedent during his lifetime by asserting there was a family relationship between the claimant and the decedent, thereby giving rise to the presumption that the services were gratuitous, such a defense is "special and affirmative, is in the nature of confession and avoidance and should have been pleaded...."

Respondents direct us to *Ellinwood v. Estate of Lyons*, 731 S.W.2d 23 (Mo.App.E.D. 1987), which involved a claim against an estate for services rendered to the decedent during his lifetime. The estate tendered an instruction hypothesizing the defense of gratuitous services (the claim was tried to a jury). *Id.* at 26. The trial court refused the instruction because the estate had not pled that defense. *Id.* The appellate court held:

> "[The estate] did not have to plead an affirmative defense in this case. Rule 55.01 provides that a defense consisting of an affirmative avoidance to any matter alleged in a preceding pleading must be pleaded. However, Rule 55 is not applicable in the present case. Both Rule 41.-01(b) and Section 472.141 RSMo.1986, provide that Rule 55 is not applicable to civil actions originating in the probate division of the circuit court unless the court orders

its application. The trial court did not order Rule 55 applicable in this case. Therefore, [the estate] was under no requirement to plead any affirmative defenses."

731 S.W.2d at 26[6].

At the time the instant case was tried, Rule 41.01(b) read as it did when *Ellinwood* was tried. Nowhere in the record do we find any order by the trial court that Rule 55 shall apply. Consequently, Respondents were not required to plead the "family relationship" defense.

Claimant's premise that Respondents failed to prove that defense was considered and rejected in our discussion of Claimant's first point.

Claimant's second point is denied, and the judgment is affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.