**In the ESTATE OF Zelda Irene ELLIS, Deceased.**

No. 26599.

Missouri Court of Appeals, Southern District, Division Two.

March 31, 2006.

William J. Lasley, Carthage, MO, for Appellant.

John Nicholas, Joplin, MO, for Respondent Countrywide Home Loans, Inc.

Peter C. Edwards, Joplin, MO, for Respondent James Ray Ellis.

JEFFREY W. BATES, Chief Judge.

Garry Ellis (Garry) appeals from a decree of final distribution in the decedent's estate of his mother, Zelda Ellis (Zelda).[1] Garry argues, *inter alia,* that the court erred in overruling an objection to the final settlement and approving the final decree of distribution because three lots inventoried in the estate were sold by private sale without proper notice being given

1. For the purpose of clarity, we will refer to members of the Ellis family by their given names. No disrespect is intended.

as required by § 473.493.[2] Because this point has merit, the case must be reversed and remanded for further proceedings. We do not reach the merits of Garry's other points on appeal due to lack of jurisdiction.

## I. Factual and Procedural History

Zelda was married to Roy Ellis (Roy). The couple had seven children: Marvin, Melvin, Nelva, Marlin, Garry, Jerry and James. In 1957, Roy and Zelda purchased a house in Reeds, Missouri. The house was located on lots 316–21 in Whitaker's Addition. At some later point in time, Zelda and Roy also became the owners of lots 322, 323 and 324 in the same addition. On June 7, 1989, Zelda and Roy executed a $12,000 promissory note payable to their daughter, Nelva. The note bore interest at 8% until fully paid and provided for 242 monthly payments of $100 commencing on July 1, 1989. The note was secured by a deed of trust on lots 316–21 (the 1989 deed of trust). From June 1989 to May 1999, Roy and Zelda made only two $125 payments on the note.

Between 1991 and 1996, the State of Missouri provided public assistance benefits to Roy and Zelda in the form of Medicaid payments for health care services. In toto, the State paid approximately $27,000 for Roy's medical care and $106,000 for Zelda's medical care.

Roy died in 1997. In January 1999, Zelda executed her last will and testament. Her will devised lots 322–24 to Marlin. The remainder of Zelda's estate was divided equally among her seven children. Marvin was named personal representative of the estate. Hereinafter, we will refer to Marvin by his given name when describing his role as one of Zelda's heirs; we will refer to him as "Personal Representative" when describing actions he took in that capacity.

Zelda died on May 12, 1999. At the time of Zelda's death, she was still the titular owner of the family home located on lots 316–21, as well as the undeveloped real estate comprising lots 322–24. On October 12, 1999, Personal Representative filed Zelda's will and an inventory of her estate in the probate division of the Circuit Court of Jasper County, Missouri. Lots 322–24 were the only real property listed in the inventory. They were valued at $12,000. Lots 316–21, which included Zelda's house, were omitted from the inventory. On October 18, 1999, Personal Representative filed an application for letters testamentary. This application also asserted that the probable value of Zelda's real estate was $12,000.

Letters testamentary were issued to Personal Representative on October 25, 1999. That same day, Personal Representative filed a petition to sell lots 322–24 (the 1999 sale petition). Notice of the proposed sale was sent to all seven heirs by mail. On November 3, 1999, the court entered an order granting the request to sell these three lots. The order specified that the lots be sold at public auction for not less than three-fourths of their $12,000 appraised value.

Three claims were filed against the estate. On March 27, 2000, James filed a claim against the estate in the amount of $1,545. He alleged this sum was due as compensation for services such as yard mowing that he had performed for Zelda. On March 30, 2000, the State filed a claim against the estate in the amount of $133,400.88. The State alleged this sum was due by statute as reimbursement for public assistance benefits paid by the Department of Social Services on behalf of

---

**2.** All references to statutes are to RSMo (2000), unless otherwise specified.

Roy and Zelda. On April 25, 2000, James filed a second claim. He alleged that: (1) he was the assignee of the $12,000 promissory note; (2) the unpaid balance on the note was $28,465.62; and (3) his claim was secured by the 1989 deed of trust.[3] Copies of the note and 1989 deed of trust, which specifically described lots 316–21, were attached to the claim form.

On May 17, 2000, the successor trustee of the 1989 deed of trust sent out notices that lots 316–21 would be sold on June 12, 2000. The sale was held as scheduled, and James purchased the real estate for $11,000. On July 21, 2000, James borrowed $20,000 from America's Wholesale Lender (AWL) to renovate the house. This debt was secured by a new deed of trust on lots 316–21.

On October 26, 2000, Personal Representative filed four documents with the court. The first document was an amended estate inventory which lowered the value of lots 322–24 from $12,000 to $1,500. The second document was an amended petition which requested an order authorizing the sale of lots 322–24 (the 2000 sale petition). No hearing was scheduled for the 2000 sale petition, and no notice was given to the heirs by mail or publication that another petition to sell the lots had been filed. The third document was an amended order of sale which authorized Personal Representative to sell these three lots at a private sale for not less than three-fourths of their appraised value as shown by the amended inventory. This amended order recited that "[n]otice of Hearing was given as provided by law." The fourth document was a report of sale. This report stated that, pursuant to the court's order of November 3, 1999, Personal Representative entered into a contract

on September 14, 2000 to sell the property to James for $1,500. The report also said that "[n]otice stating the time, place and terms of said private sale was given as required by law." In point of fact, no such notice had been given. On November 6, 2000, the court entered an order confirming the private sale of lots 322–24 to James. The court stated that the sale had been conducted pursuant to the November 3, 1999 order of sale. The confirmatory order authorized Personal Representative to execute and deliver a deed to these three lots to James.

Personal Representative filed his final settlement on October 22, 2001. Thereafter, Garry filed timely objections to the settlement pursuant to § 473.590. In those objections, Garry asserted that: (1) Zelda's house should have been included in the estate's inventory; (2) the June 2000 foreclosure sale was illegal because the $12,000 note was executed in fraud of creditors, lacked consideration and was time-barred; and (3) lots 322–24 had been sold for $1,500 at a private sale without proper notice being given to Zelda's heirs. If Garry's objections were sustained, he requested the following relief from the court: (1) the June 2000 foreclosure should be set aside; (2) Zelda's house should be returned to the estate inventory; (3) lots 316–21 should be declared to be free and clear of all encumbrances of Nelva, James or any subsequent purchasers or lenders; and (4) the sale of lots 322–24 should be set aside, and that real property returned to the estate's inventory.

After conducting an evidentiary hearing, the court overruled all of Garry's objections to the final settlement. The court entered a final decree distributing the bal-

---

**3.** In January 2000, Nelva had assigned her interest in the note and the 1989 deed of trust to James.

ance of the estate, which consisted of $6,149.02 in cash, to the State in partial payment of its claim.[4] Thereafter, Garry filed a timely notice of appeal from the court's decree of distribution. Additional facts necessary to the disposition of the case are included below as we address Garry's four points on appeal.

## II. Standard of Review

■ The trial court's final decree of distribution will be upheld unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *In re Estate of Moore,* 136 S.W.3d 163, 164 (Mo.App.2004); *In re Estate of Frein,* 967 S.W.2d 258, 259 (Mo. App.1998); *Matter of Ridgeway,* 877 S.W.2d 167, 168 (Mo.App.1994).

## III. Discussion and Decision

■ To better facilitate our discussion of the issues, we will address Garry's points on appeal in reverse order. His fourth point concerns the sale of lots 322–24. Garry contends the court erred in overruling his objection and in approving the final settlement because these lots were sold to James at a private sale for $1,500 without proper notice being given pursuant to § 473.493. We begin our analysis by examining the text of § 473.493. In pertinent part, this statute states:

1. An executor or administrator may file a petition to sell, mortgage or lease any real property belonging to the estate. . . . Upon the filing of the petition, the court shall fix the time and place for the hearing thereof.

2. Notice of the hearing shall state briefly the nature of the application and shall be given to heirs and devisees whose names and addresses appear in the files or records of the case in the probate division of the circuit court and who are interested persons and to such other persons as the court directs. The notice shall be given by ordinary mail or by publication or both as ordered by the court. . . .

3. At the hearing and upon satisfactory proofs, the court may order the sale, mortgage or lease of the property described or any part thereof. . . .

In *Clapper v. Chandler,* 406 S.W.2d 114, 120–21 (Mo.App.1966), we held that a trial court's order authorizing the sale of the decedent's real property had to be set aside because his heirs did not receive the notice prescribed by § 473.493. We reach the same conclusion here.

After Personal Representative filed the 1999 sale petition, the record demonstrates that all of the heirs and devisees of the estate were given notice by mail that a hearing on the petition would be held on November 3, 1999. On that date, the court entered an order authorizing the sale of lots 322–24 at public auction for no less than $9,000. Thus, the notice requirements of § 473.493.2 were initially satisfied.

The problem presented here is that no sale complying with the terms of the November 1999 order was ever held. Instead, Personal Representative filed the 2000 petition, which requested permission to sell lots 322–24 in a different manner and for a far smaller sum than originally authorized. After this amended petition was filed, the court failed to schedule a hearing or send notice thereof to the heirs and devisees. The amended sale order, which authorized Personal Representative to sell lots 322–24 at a private sale for not less than $1,125, was signed the same day

---

4. The State's claim was a 7th class claim. James' two claims were 9th class claims.

Therefore, he received none of the estate assets in the final order of distribution.

the amended petition was filed. This procedure utterly failed to comply with the notice requirements of § 473.493. Although this lack of notice to the heirs was brought to the court's attention via Garry's objections to the final settlement, the court failed to set this order of sale aside. That error necessitates a reversal of the final decree of distribution. *Clapper*, 406 S.W.2d at 120–21.[5]

While conceding that Garry did not receive notice by mail or publication as required by § 473.493, James argues reversal is not required. James points to language in *Clapper* stating that "if appellants had voluntarily appeared at the hearing upon the petition, they would have waived the notice provisions...." *Clapper*, 406 S.W.2d at 120. James contends lack of written notice is not an issue because the trial court could have found that Garry attended a hearing before Judge Jon Dermott on October 26, 2000, at which the court authorized the private sale of lots 322–24.[6] We find this argument unpersuasive because the court made no such finding, and, in any event, Garry's testimony would not reasonably support any such inference.

As noted above, all of the heirs were mailed notices that a hearing concerning the 1999 sale petition would be held on November 3, 1999. The docket entry for that date states: "HEARING: CASE IS CALLED. GARRY ELLIS AND MARGERY ELLIS APPEAR—COURT APPROVES ORDER TO SELL PROPER-TY." Garry testified that he appeared at a probate hearing before Judge Dermott concerning the three lots and offered to buy them for $12,000. That was the original appraised value of lots 322–24. Garry then gave the following testimony:

Q. Now, I'll ask you to assume that the record does call for a public auction of those three, did you ever receive a new notice of sale advising that this was going to be sold privately?

A. No.

Q. To your brother James?

A. No.

Q. For fifteen hundred dollars, rather than twelve thousand?

A. No.

Garry's testimony is corroborated by the legal file. The court's docket sheet memorializes the filing of the amended inventory and 2000 sale petition and further reflects that the order authorizing a private sale of the three lots was executed by Judge Dermott and filed the same day. There is nothing in the record to suggest that the court scheduled a hearing, sent out notice thereof or held a hearing on October 26, 2000. The record before us could not reasonably support a finding that Garry waived his right to notice that Personal Representative was requesting authority to sell lots 322–24 privately for a vastly smaller sum than originally authorized approximately one year earlier.

**5.** Garry argues the lack of notice is jurisdictional and renders the sale void. We cannot agree with his argument. In 1981, § 473.013 was amended to expressly provide that the probate division has jurisdiction of a decedent's real property located in this state from the first publication of notice of letters pursuant to § 473.033. This amendment corrected the jurisdictional deficiency discussed in *Clapper*. *Carpenter v. White*, 664 S.W.2d 276, 278 n. 1 (Mo.App.1984). Nevertheless, the lack of proper notice still constitutes a significant error in procedure that renders the sale voidable and subject to being set aside on direct appeal.

**6.** It is important to point out that the November 3, 1999 order of sale and the October 26, 2000 order of sale were both entered by Judge Dermott. Garry's objections to the final settlement were ruled by Judge David Dally.

In sum, Garry did not receive the written notice required by § 473.493 that Personal Representative had filed a petition requesting the authority to sell lots 322–24 at a private sale for as little as $1,125. The record fails to support any reasonably inference that Garry waived his right to such notice by appearing at any hearing on the 2000 sale petition. Therefore, we hold that the trial court erred in failing to set aside its October 2000 order authorizing the private sale of lots 322–24. Garry's fourth point is granted.

■ We will discuss Garry's remaining three points on appeal as a group. Garry contends the trial court erred in overruling the objections to the final settlement and approving the final order of distribution because: (1) Personal Representative failed to include Zelda's house in the estate inventory as required by § 473.233; (2) her house should not have been sold at a foreclosure proceeding or encumbered with another deed of trust since six of the seven residuary beneficiaries did not receive the written notice required by § 443.325; (3) a prior note and deed of trust, which served as the basis for the foreclosure sale, were executed in fraud of potential creditors, lacked consideration and were time-barred by § 516.110. For the reasons discussed below, we are unable to address the merits of these three points.

■ Our examination of these points reveals that they all assert trial court error in determining who held title to Zelda's house and the nature of the interests held by various other persons in this real estate. There is a specific and comprehensive statutory procedure in the Probate Code to litigate such claims. *See* § 473.340. This statute gives the probate division original and exclusive jurisdiction over a proceeding to discover assets. *Ryan v. Spiegelhalter*, 64 S.W.3d 302, 305 (Mo. banc 2002). "The purpose of a dis-

covery of assets lawsuit is to obtain all of the assets that should be included in the probate estate." *Estate of Dean v. Morris*, 963 S.W.2d 461, 465 (Mo.App.1998). That includes real estate because all species of property are encompassed by a discovery of assets proceeding. *Ryan*, 64 S.W.3d at 306; *In re Estate of Boatright*, 88 S.W.3d 500, 505 (Mo.App.2002). A petition to discover assets can be filed at any time prior to approval of the final settlement. *In re Nelson's Estate*, 237 Mo.App. 28, 166 S.W.2d 333, 337 (1942).

■ Section 473.340 authorizes "[a]ny personal representative, administrator, creditor, beneficiary or other person who claims an interest in property which is claimed to be an asset of an estate or which is claimed should be an asset of an estate" to obtain a "determination of the title, or right of possession thereto, or both." § 473.340.1. A discovery of assets proceeding is initiated by the filing of a verified petition. "The petition shall describe the property, if known, shall allege the nature of the interest of the petitioner and that title or possession of the property, or both, are being adversely withheld or claimed." *Id.* "Service of summons, petition and answer thereto together with all subsequent proceedings shall be governed by the Missouri Rules of Civil Procedure." § 473.340.2. The issues in a discovery of assets proceeding are made up by the petition and the answer(s). *In re Estate of Miller*, 9 S.W.3d 760, 765 (Mo. App.2000). Most importantly, "[a]ny party may demand a jury trial." § 473.340.2. After the issues are tried, the court must "determine the persons who have an interest in said property together with the nature and extent of any such interest." § 473.340.3.

In the case at bar, Garry attempted to raise the issues of who properly held title to Zelda's house, what interests other per-

sons had in that property, and whether the house should be an asset of· the estate by filing objections to the final settlement pursuant to § 473.590. The trial court acquiesced in that request and proceeded to hold a hearing and decide the facts in order to rule on Garry's objections. We have not been able to find any authority supporting the proposition that title to property may be adjudicated by the court via the procedure of ruling on objections to a final settlement. Indeed, the only extant Missouri appellate decision on point holds otherwise. In *Wilson v. Ruthrauff*, 82 Mo.App. 435 (Mo.App.1900), the appellate court held that the probate judge did not have the authority to adjudicate title to property by ruling on a creditor's objection to the administrator's final settlement. *Id.* at 440–41. One important reason for so holding was that a contrary ruling would deprive the administrator of his right to have a jury decide the factual issues presented. *Id.* at 441.

In the case at bar, none of the procedures necessary to initiate and litigate a discovery of assets proceeding were followed. Garry's objections to the final settlement contained no reference to § 473.340. The record contains nothing to suggest that any of the parties understood they had a right to demand a jury trial. No verified petition was filed and served upon the other parties, and no answers to such a petition were filed. Thus, there are no pleadings in the record to demarcate exactly what issues were presented for determination.

In *Ex parte Fowler*, 310 Mo. 339, 275 S.W. 529 (banc 1925), the Supreme Court addressed the effect of a probate court purporting to adjudicate a discovery of assets proceeding without any issues being framed. At that time, the issues in such a proceeding were made up by the interrog-

atories and answers thereto. *Id.* at 532. Our Supreme Court held, in pertinent part, as follows:

> [T]here is no case until interrogatories are filed, and answer made thereto. Under the statute, it is then, and then only, that' we have issues to be determined by a jury or by the court. These interrogatories serve as the pleadings in the case, and make the triable issues. Absent ˙triable issues, and a trial, the court is without power to enter a judgment or ·order. Judgments must be upon ˙issues made, and without issues made there is nothing upon which the court can act or make an adjudication. If an adjudication is made, and a judgment entered, it is a nullity.

*Id.* at 533; *see also In re Baker's Estate*, 359 S.W.2d 238, 242–43 (Mo.App.1962) (without the issues being raised in the manner provided iri the discovery of assets statute, the trial was premature and necessitated reversal of the judgment).

*Matter of Passman's Estate*, 537 S.W.2d 380 (Mo. banc 1976), contains a similar discussion. In that case, the estate's administrator filed an affidavit for discovery of assets against Graves. *Id.* at 381. At that time, the issues in a discovery of assets were framed by interrogatories and the answers thereto. *See* § 473.350.[7] In Graves' interrogatory answers, she contended that the administrator was holding $4,022 in cash belonging to her. The probate code contained a specific statutory provision for trying title to personalty in the custody of an administrator or executor. *See* § 473.357. Such a claim had to be initiated by filing a verified petition alleging, *inter alia*, that the petitioner was the owner of the property in possession of the executor or administrator. The petition and the answer thereto filed by the execu-

---

7. References to §§ 473.350 and 473.357 are to RSMo (1969).

tor or administrator framed the issues to be decided. Graves attempted to litigate her claim to the cash without following the statutory procedures set out in § 473.357. Instead, she contended that her interrogatory answers adequately presented the claim for the probate court's consideration. *Id.* at 384. The probate court acquiesced in Graves' request and proceeded to try the claim. Our Supreme Court held that the court lacked jurisdiction to adjudicate Graves' claim:

> Graves contends that her answer should be construed as the petition required under § 473.357. This is not possible because her answer, even though verified, does not comply with the mandate of that section. For instance, that section requires the person filing the petition alleging the estate is holding personal property belonging to that person to allege how he acquired ownership thereof. Such section also provides for an answer to be filed by the estate and the issues raised by the petition and answer are those to be tried.... The statutes as they existed at the time this proceeding was begun set out completely the procedure for claims involving property held by another, but alleged to belong to the estate, and for claims involving property held by the estate, but alleged to belong to another.... By failing to follow the statutory dictates for the presentation of her claim of ownership of money held by the estate, the court did not have jurisdiction of this claim by Graves.

*Id.* at 385.

▆ In *State ex rel. Lambert v. Flynn,* 348 Mo. 525, 154 S.W.2d 52 (banc 1941), our Supreme Court identified the three essential prerequisites that must exist for a court to adjudicate a controversy: "(1) jurisdiction of the subject matter; (2) jurisdiction of the res or the parties; (3) and

jurisdiction to render the particular judgment in the particular case." *Id.* at 57. The last of these is sometimes referred to as the jurisdictional competency of the court to render judgment on a particular issue in the case. *In re Marriage of Hendrix,* 183 S.W.3d 582, 588 (Mo. banc 2006). As the *Flynn* court explained, jurisdictional competency may not be supplied by the parties' consent or acquiescence:

> [T]he third essential, jurisdiction to render the particular judgment in the particular case (sometimes called 'competency'), partakes of the character of one or the other of the first two. Where the lacking element of jurisdiction goes to the personal privilege of the litigant, it may be waived. But when it depends on the power of the court under a public policy established by statute or otherwise, it cannot be waived. It is said in 21 C.J.S., Courts, § 85, pp. 128, 129: 'If the court cannot try the question except under particular conditions or when approached in a particular way, the law withholds jurisdiction unless such conditions exist or unless the court is approached in the manner provided, and consent will not avail to change the provisions of the law in this regard.' In the instant case respondent's court had no power to try the case until statutory conditions had been complied with.... It partook of jurisdiction of the subject matter and could not be waived by mere appearance of the relators.

*Flynn,* 154 S.W.2d at 57 (footnote omitted).

It is evident that Garry sought a determination of title to Zelda's house and the nature and extent of the interests, if any, held by others in that real estate. The manner in which Garry attempted to litigate these questions, however, was by filing objections to the final settlement pursuant to § 473.590 and having the court

hear and rule upon those objections. We conclude that the trial court lacked the jurisdictional competency to determine title to Zelda's house, or the interests held by other persons in such property, via this procedure. Section 473.340 provides the exclusive statutory mechanism and jurisdictional basis for the probate division of the circuit court to determine such issues.

 "Regardless of the manner in which it is stated, it is a well-settled principle of law that where the trial court did not have jurisdiction to determine the issues presented on the merits, the court of appeals jurisdiction does not extend to a determination of the appeal on the merits. It is also equally established that jurisdiction may not be conferred on a court by waiver and that a court has a duty to sua sponte inquire into and determine whether it has jurisdiction...." *Hart v. Board of Adjustment of City of Marshall,* 616 S.W.2d 111, 113 (Mo.App.1981) (citations omitted). A judgment rendered without jurisdiction must be reversed, regardless of the manner in which the issue is brought to the court's attention. *Ruestman v. Ruestman,* 111 S.W.3d 464, 477 (Mo.App.2003).

The final decree of distribution is reversed. The case is remanded for further proceedings consistent with this opinion.

SHRUM, P.J., and GARRISON, J., Concur.