

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| In the Estate of<br>ROSETTA F. KEEN, deceased, | ) | |
| | ) | |
| LOUIE R. KEEN, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | SD33801 |
| | ) | |
| AMBER J. WOLFE, individually and | ) | **Filed: Apr. 11, 2016** |
| as Personal Representative of the Estate | ) | |
| of Rosetta F. Keen, and CYNTHIA A. | ) | |
| KEEN, | ) | |
| | ) | |
| Respondents-Respondents. | ) | |

APPEAL FROM THE CIRCUIT COURT OF BARRY COUNTY

Honorable Carr Woods, Senior Judge

**<u>AFFIRMED</u>**

Louie R. Keen appeals the February 2015 "<u>FINAL SETTLEMENT APPROVED</u>

<u>FINDING AND ORDER OF DISTRIBUTION</u>" ("the final distribution") entered in the

probate estate of his deceased mother, Rosetta F. Keen, pursuant to section 472.160(14).[1]

Louie presents nine points that collectively assert trial court errors in overruling his

objections to the final distribution and denying his motion invoking "no-contest" provisions

---

[1] Unless otherwise indicated, all statutory references are to RSMo 2000. For purposes of clarity and simplicity, we will refer to family members by their first names; no disrespect or familiarity is intended. Rosetta's property subject to administration in the instant probate court case will be referred to as "the Estate," and we refer to the case itself as "the Estate case."

from both Rosetta's will and a trust she had created.  For ease of analysis, we have organized the points around four basic contentions distilled from Louie's points:  (1) Louie's sister and personal representative of the Estate, Amber J. Wolfe, and another sister, Cynthia A. Keen, violated no-contest clauses in Rosetta's will and/or trust;[2] (2) Amber's inventory of the Estate incorrectly omitted a particular bank account owned or possessed by Rosetta at her death; (3) Amber's claim against the Estate totaling $46,288.72 for various expenses was invalid because the expenses were either not owed by Rosetta at her death or the trial court did not approve them in advance; and (4) attorney fees totaling $22,041.14 incurred by Amber in connection with a previous appeal by Louie in the Estate case should not have been allowed because the fees did not benefit the Estate.[3]

Finding no merit in Louie's points, we affirm.

### Applicable Principles of Review and Governing Law

"The trial court's final decree of distribution will be upheld unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law." **In re Estate of Ellis**, 187 S.W.3d 344,

---

[2] In his notice of appeal, Louie listed attorney Donald Cupps, and the law firm of Ellis, Cupps & Cole, P.C., as respondents.  He likewise listed Mr. Cupps and the firm as respondents in his objections to the final distribution.  Mr. Cupps formerly represented Rosetta, and he later represented Amber and Cynthia.  Neither Mr. Cupps nor his firm has filed a brief in this appeal.  Amber and Cynthia's motion for an order dropping Mr. Cupps and his firm as respondents in this appeal was taken with the case.  Louie did not respond to the motion, and he has failed to identify any trial court order adding Mr. Cupps or the law firm as a party.  To become a party, a person must either be named in the initial pleadings or added later by order of the trial court. *See **In re Estate of Miller***, 9 S.W.3d 760, 765 (Mo. App. S.D. 2000); Rule 52.11.  And "[a]bsent a suggestion of death or the like, this [appellate] court has no authority under the statutes, the rules or the case law to permit addition or substitution of parties." ***Aetna Life Ins. Co. v. Litteer***, 621 S.W.2d 376, 379 (Mo. App. W.D. 1981).  The motion to drop Mr. Cupps and the firm as respondents is granted, and our references to "Respondents" are solely to Amber and Cynthia.  All rule references are to Missouri Court Rules (2015).

[3] The prior notice of appeal in the Estate case, assigned case no. SD32809 ("the first Estate appeal"), challenged a May 2013 amended judgment discussed, *infra* ("the amended judgment").  We dismissed that appeal because we found the notice of appeal to be "untimely and ineffective[.]"  The record in the instant appeal includes the record transferred from SD32809, the contents of which consist of a legal file, a supplemental legal file, and a transcript.  The legal files from the first Estate appeal also include docket entries and some pleadings associated with two separate cases involving Rosetta's trust.  We will discuss those cases more fully, *infra*, and refer to them as "the first trust case" and "the second trust case."

2

348 (Mo. App. S.D. 2006).  The same is true for "review of a trial court's decision to allow a claim against an estate[.]"  *In re Estate of Miller*, 264 S.W.3d 664, 666 (Mo. App. E.D. 2008).  We presume that the trial court's judgment is correct, and the appellant bears the burden of proving it erroneous.  *Humphreys v. Wooldridge*, 408 S.W.3d 261, 264 (Mo. App. S.D. 2013).  When no request for specific findings and conclusions was made, we presume that the trial court made findings consistent with the judgment entered, and we will affirm the judgment under any reasonable theory supported by the evidence.  *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo. App. S.D. 2010).

"[W]e defer to the trial court's findings of fact, given the trial court's superior ability to judge the credibility of witnesses."  *In re Estate of Moore*, 136 S.W.3d 163, 164 (Mo. App. S.D. 2004).  "The [trial] court is free to believe all, part, or none of the testimony of any witness[,]" and "we accept as true the evidence and permissible inferences, which may be drawn favorable to the prevailing party, and disregard the contradictory testimony."  *In re Estate of Markley*, 922 S.W.2d 87, 95 (Mo. App. W.D. 1996).

### Factual and Procedural Background

Rosetta's husband (the parties' father), Gary Keen, predeceased Rosetta in 2005.  After Gary's death, Rosetta operated "4-K Farms" as a sole proprietorship.  Louie testified that Rosetta "continue[d] to run the income and expenses of the farm out of her personal account[.]"

In March 2011, Rosetta entered the hospital, and she had Amber retrieve a particular checkbook from Rosetta's home that Amber had not previously possessed.  Thereafter, Amber began paying Rosetta's bills using that checkbook.  The checking account's "SIGNATURE CARD" (dated in 2006):  (1) identified "[Rosetta] DBA 4-K Farms" as the

3

account owner; (2) indicated that the account was a "BUSINESS ACCOUNT" for a "Sole Proprietorship"; (3) listed Amber as "Signer Only"; and (4) designated Amber as the "Payable on Death (POD)" beneficiary ("the POD account"). Amber understood that the money in the POD account belonged to Rosetta and had been generated by Rosetta. There was no indication on the signature card that Amber was identified in anything other than her individual capacity. The POD account had originally been held by Rosetta and Gary, and Amber was added between 2000 and 2004 "[j]ust as a cosigner." The POD account was the account from which "all of the farm expenses were paid[.]"

On April 4, 2011, Rosetta met with Mr. Cupps in her hospital room to revise her estate plan. The resulting "**LAST WILL AND TESTAMENT OF ROSETTA KEEN**" ("the Will") nominated Amber as the personal representative of the Estate. The Will provides that apart from "tangible personal property[,]" the remainder of the Estate is bequeathed "to the Trustee of the Rosetta Keen Revocable Trust Dated August 2, 2006, as restated." In the absence of another list,[4] the tangible personal property was to be divided equally among Louie, Cynthia, and Amber. Article V of the Will ("the Will's no-contest clause") states: "If any of my children contest any provision of this Last Will and Testament or my Revocable Trust as restated this date, they shall receive nothing."

The "**APRIL 4, 2011 RESTATEMENT OF REVOCABLE TRUST AGREEMENT OF ROSETTA KEEN**" ("the Trust") references the trust Rosetta first created on August 2, 2006, and it names Amber as "Successor Trustees [sic]" to Rosetta. The Trust provides for the conveyance of a tract of particularly described real property to Louie and another to Amber. The Trust directs the trustee "to retain all other real estate,

---

[4] No party alleges the existence of any list that might require a different distribution of the tangible personal property.

4

livestock and farm equipment, and to operate the same as a farming operation" for 12 years. Net income, apart from the trustee's fee generated from the farming operation, is to be split equally between Louie, Cynthia, and Amber, along with any property remaining at the end of that 12-year period. Part "EIGHTH" of the Trust provides: "The Trustee shall have all powers conferred upon Trustees by Chapter 456 of the Revised Statutes of the State of Missouri. Specifically the Trustee is directed to retain real estate, cattle and farm equipment which may not be acceptable investments for fiduciaries."

Part "SECOND" of the Trust, paragraph B.2(b) ("the B.2(b) clause"), states: "The Trustee is directed to distribute to [Amber] the 40 acres more or less owned by the Trust and/or owned by [Rosetta] and located in Section 1, Township 22, Range 28, Barry County, Missouri."

Part "FIFTEENTH" of the Trust ("the Trust's no-contest clause"[5]) states:

> If any beneficiary of this trust or any other person contests the validity of this trust or any provision of this trust or files any action or makes any claim seeking distribution to him or her of an amount larger than what is provided for herein, then the Trustees [sic] are directed to distribute nothing to said contesting or claiming beneficiary and that person shall receive nothing from this trust or trusts created herein nor anything from [Rosetta]'s estates.

Rosetta died on May 10, 2011, and the Will was presented to the probate division of the circuit court of Barry County a few days later. The judge or clerk of the probate division examined the Will, "admitted [it] to probate as the Last Will and Testament of [Rosetta]," and issued Letters Testamentary (Supervised Administration) appointing Amber personal representative. No money was added to the POD account after Rosetta's death. Amber used the POD account to pay Rosetta's bills from the date of Rosetta's death until May 22, 2011.

---

[5] We will refer collectively to the Will's no-contest clause and the Trust's no-contest clause as "the no-contest clauses."

In June 2011, Amber filed a claim against the Estate for "$46,288.72 for reimbursement of personal funds paid by [Amber] for [Rosetta]'s last illness, funeral costs, and household/farm expenses" between May 10-22, 2011 ("the expense reimbursement claim"). The trial court appointed an administrator ad litem, and the trial court approved the expense reimbursement claim on March 21, 2012. We will summarize additional information about the expense reimbursement claim in our discussion of Point VIII, *infra*. The balance of the POD account remaining after Amber had paid the bills identified in the expense reimbursement claim was $31,268.42 ("the POD balance"). Amber withdrew that remaining balance in her personal capacity in June 2011. Amber eventually established a bank account for the Trust, and she began using that account to pay for expenses involving the cattle and real estate.

In November 2011, Amber, as successor trustee, filed case no. 11BR-PR00133 -- the first trust case -- seeking a judicial declaration "as to whether she is entitled to sell" "a small tract of real estate" ("the small tract") specifically described in the amended petition. The amended petition alleged that Rosetta had listed the small tract for sale before her death and it was "not economical to farm due to its location, terrain and composition"; that it was "not prudent" to keep it; and that selling it would be in the best interest of the beneficiaries. The amended petition cited the Trust provision requiring the payment of net profits of the farming operation using "'GAAP'" principles[6] and alleged "[t]hat the accountant for the Estate and Trust recommends that income be calculated according to 'Other Comprehensive Basis of Accounting' rather than 'GAAP' because it allows income to be calculated on the same basis as taxes."

---

[6] The amended petition defined "GAAP" as "Generally Accepting [sic] Accounting Principles[.]"

6

Louie's counsel entered an appearance in the first trust case, but the docket entries do not indicate that he filed an answer or other responsive pleading.[7] Cynthia appeared *pro se*, and she "agree[d] to the entry of a Judgment granting the relief sought." In December 2011, the trial court entered an order[8] modifying the Trust such that the trustee was "authorized and empowered to sell real estate which is not economical to the farm due to its location, terrain, and composition." The trustee was also directed "to use other comprehensive basis [sic] of accounting rather than 'GAAP' as an accounting method."

In February 2012, Respondents initiated case no. 12BR-PR00014, the second trust case. Count I of the first amended petition sought a judicial declaration that an action to reform the Trust "based upon scrivener's error and/or mutual mistake does not violate the" Trust's no-contest clause. Count II of the first amended petition sought an order reforming the B.2(b) clause as to the land's section number and acreage and to add a reference to the property as having been Rosetta's home. So reformed, the clause would read as follows: "*The Trustee is directed to distribute to [Amber] [Rosetta's] home and 46 acres more or less owned by the Trust and/or owned by [Rosetta] and located in Section 6, Township 22, Range 27, Barry County, Missouri.*" The first amended petition asserted that Rosetta intended "that the family home and approximately 46 acres surrounding the family home would be distributed to [Amber]"; the "family home" "is located in Section 6"; but "because of a scrivener's error the Trust mistakenly described the property to be transferred to [Amber] as being in Section 1"; and "the error in description was a mutual mistake of the parties."

---

[7] Louie has different counsel in the instant appeal.

[8] The order is not denominated "judgment" or "decree," see Rule 74.01(a), and no action has been taken in the first trust case since November 2013, when Louie's current attorney requested copies of certain documents in the file that he intended to include in a supplemental legal file to be submitted in the instant appeal.

Louie filed an answer in the second trust case, alleging, *inter alia*, that the amended petition "invoked the [Trust's] no-contest clause[,]" and the B.2(b) clause "is unambiguous . . . and should not . . . be modified." Louie's answer also included a counterclaim that quoted *both* no-contest clauses and alleged that *both* clauses had been violated by: Respondents' initial filing of the second trust case, Amber's filing of the first trust case, and Cynthia's consent to judgment in the first trust case. Amber moved to dismiss Louie's counterclaim.

On April 19, 2012, Louie filed a motion in the Estate case asking the trial court to set aside its award of Amber's expense reimbursement claim on the basis that any individual "expenses for maintenance of livestock and real property" were not valid claims because the Estate owned neither, and everything in Amber's expense reimbursement claim "appear[ed] to be paid from a joint account [Rosetta] had established for the express purpose of paying expenses."

Later that month, Louie filed a "MOTION TO INVOKE NO CONTEST PROVISION IN WILL" in the Estate case ("the no-contest motion") that alleged Amber had violated both no-contest clauses by seeking in the first trust case to "to sell real property" and modify the accounting method required by the Trust, filing the expense reimbursement claim in the Estate case, and seeking in the second trust case to reform the real property distribution so that she would be awarded a different tract of land that was worth more money than the land described in the Trust. The no-contest motion alleged that Cynthia had violated both no-contest clauses by consenting to judgment in the first trust case and by participating with Amber in the second trust case.

8

In January 2013, the trial court held a combined hearing in the Estate case and the second trust case ("the combined hearing").[9] The matters at issue included both counts of the pending petition in the second trust case, Louie's counterclaim in the second trust case, the no-contest motion in the Estate case, and the expense reimbursement claim.

A "**JUDGMENT**" entered in the second trust case on March 20, 2013 declared Amber's request to reform the Trust "based upon scrivener's error and/or mutual mistake did not violate the" Trust's no-contest clause and the judgment reformed the B.2(b) clause to provide that "[t]he Trustee is directed to distribute to [Amber] [Rosetta's] home and 46 acres more or less owned by the Trust and/or owned by [Rosetta] and located in Section 6, Township 22, Range 27, Barry County, Missouri." The second Trust case judgment also denied Louie's counterclaim.[10] This court later denied Louie's motion for leave to file a late notice of appeal in the second trust case.

On May 26, 2013, the trial court entered an "amended judgment"[11] in the Estate case that denied Louie's motion to set aside Amber's expense reimbursement claim. The trial court also denied the no-contest motion, specifically finding that "none of the alleged actions of [Amber and Cynthia] as set forth in the [no-contest motion] constitute a violation of [the Will's no-contest clause]."

In August 2014, Amber sought an order in the Estate case allowing her to pay $20,621.25 to Mr. Cupps and $1,420.16 to Respondents' current counsel for "legal services and incurred expenses in handling the [a]ppeal matters filed against the [E]state[.]" The request incorporated itemized fee statements from both attorneys. Louie filed suggestions in

---

[9] The same judge that presided over the combined hearing also presided over subsequent hearings in the Estate case, including the hearing on the final distribution.

[10] The judgment also declared that Louie's request that the trial court remove Amber as trustee of the Trust did not constitute a violation of the Trust's no-contest clause.

[11] The "amended judgment" was not actually a judgment as it did not dispose of all claims in the Estate case.

9

opposition, and in August 2014, the trial court entered an order allowing the appellate attorney fees to be paid from the Estate ("the appellate attorney fees order"). Additional information concerning this order will be addressed in our analysis of Point IX, *infra*.

In October 2014, Amber filed the final settlement for the Estate, which included bank statements, copies of checks, and a proposed order approving the final settlement and distributing the remaining assets ("the proposed order"). Based upon the figures contained in the final settlement, the proposed order divided the proceeds of an auction of household goods and furnishings in equal shares between Amber, Cynthia, and Louie, then distributed to Amber, as the trustee of the Trust, the remaining assets that consisted of a tract of real estate,[12] corporate stock, dividends, and cash. That same month, Louie filed objections to the final settlement ("final settlement objections"), but he did not contend that Amber had violated the Trust's no-contest clause by "seeking distribution" of the POD balance.

On two dates in January 2015, the trial court held a hearing on the final settlement objections. At Louie's request, the trial court took judicial notice of the legal file, supplemental legal file, and the briefs from the first Estate appeal; exhibits from the combined hearing; the petition and order concerning the appellate attorney fees; and the annual and final settlement in the Estate case. Included in the legal file from the first Estate appeal were Amber's first amended petition and Louie's counterclaim from the second trust case, along with the judgment entered in the second trust case. The signature card and bank statements from the POD account were also admitted into evidence.

---

[12] Counsel for the parties subsequently stipulated that Rosetta had transferred her real estate to the Trust "with the exception of 40 acres which was left off."

10

During the hearing, Amber's attorney objected to Louie's cross examination of Amber about Cynthia's reading and signing of the first petition in the second trust case, stating:

> Your Honor, this is beyond the final settlement. This is [sic] – [Louie's counsel] apparently wants to relitigate the prior judgment concerning the reformation and the no-contest clause. I don't believe that that's appropriate in the final settlement. I think the objections to the final settlement deal with the expenditures that [Amber, as] personal representative has made or assets – or accounting for assets.

Louie's counsel replied that the purpose of the hearing was to permit the trial court an "opportunity to correct errors it made[,]" and Amber's counsel pointed out that "that judgment" was a "judgment in a separate case altogether[.]" The trial court sustained the objection. We presume that references to "the prior judgment" and "that judgment" were to the second trust case judgment because it is the only judgment in the record that both reformed the Trust and made a final ruling on the no-contest issues.

In February 2015, the trial court overruled Louie's final settlement objections after having "carefully consider[ed] the pleadings, testimony and credibility of witnesses, the hearing exhibits and the applicable statutes and case law," and it entered the final distribution Louie now timely appeals.

**Analysis**

*Points I-VI – The No-Contest Clauses*

Louie's first six points contend the trial court erred in denying the no-contest motion and overruling his final settlement objections for the following reasons:

Point I:  The Will's no-contest clause was violated when Amber sought in the first trust case to modify provisions in the Trust that directed the trustee to "retain real estate" as part of a farming operation for 12 years and apply "GAAP" principles in calculating income.

11

Point II: The Will's no-contest clause was violated when Respondents sought to reform clause B.2(b) of the Trust in the second trust case.

Point III: The Trust's no-contest clause was violated when Respondents sought to reform clause B.2(b) of the Trust in the second trust case.

Point IV: The Trust's no-contest clause was violated when Amber sought "an amount larger than what the Trust provided for her" by "making said reformation claim" in the second trust case.

Point V: The Trust's no-contest clause was violated when Amber sought "an amount $46,288.72 larger than what the Trust provided for her" by filing the expense reimbursement claim in the Estate case.

Point VI: The Trust's no-contest clause was violated when Amber sought "an amount $31,268.42 larger than what the Trust provided for her" by making a "claim" for the POD balance.

Respondents are correct in claiming that Louie cannot reassert the same issues regarding the no-contest clauses that were previously adjudicated in the second trust case. "Collateral estoppel, or issue preclusion, is used to preclude the relitigation of an issue that already has been decided in a different cause of action." *Brown v. Carnahan*, 370 S.W.3d 637, 658 (Mo. banc 2012). "This doctrine may be employed offensively or defensively." *Id.* at 659. "The doctrine requires that the issue was fully and fairly litigated, that the issue was essential to the earlier judgment, and that the earlier judgment be final and binding on the party against whom it is asserted." *Sexton v. Jenkins & Assocs., Inc.*, 152 S.W.3d 270, 273 (Mo. banc 2004).

Louie's counterclaim in the second trust case alleged that Respondents had violated *both* no-contest clauses (Trust and Will) in *each* of the trust cases by litigating whether particular real estate could be sold from the Trust, the accounting method could be changed, and the B.2(b) clause could be reformed. Points I through IV are all predicated on these same failed challenges, and the rulings against Louie on them were essential to the denial of

12

his counterclaim.  These rulings in the second trust case judgment became final and binding on Louie when his appeal from that judgment was dismissed in case SD32790.

Louie argues in his reply brief that there has been no *prior* adjudication or *relitigation* of the no-contest clauses because:  (1) "[t]he administration of a decedent's estate is deemed one proceeding that is concluded by the entry of a decree of final distribution" such that it is illogical for the second trust case to be considered a prior adjudication; (2) the Estate case was filed first; and (3) "the essential facts regarding [the no-contest clauses] claims were presented **at the same time**" at the combined hearing.  Louie cites *In re Estate of Straszynski*, 265 S.W.3d 394, 395 (Mo. App. S.D. 2008), for the principle that the administration of a decedent's estate is one proceeding, but *Straszynski* does not address separate litigation over a trust agreement; it addresses the payment of attorney fees in a decedent's estate.  That the second trust case was filed after the Estate case was opened -- and that there was a combined hearing for both cases -- does not alter the fact that the judgment in the second trust case (a separate proceeding with its own case number) was entered before the final distribution was entered in the Estate case.  *Cf. In re Gould's Estate*, 547 S.W.2d 863, 867-68, 869 (Mo. App. K.C.D. 1977) (the issue of whether attorney "was guilty of misconduct or wrongful conduct as executor and attorney" in a decedent's estate was conclusively determined by a final judgment in a disciplinary proceeding that had started *after* the attorney had applied for a distribution from the estate).

Louie also argues that "because Respondents did not plead collateral estoppel below, they cannot now rely on collateral estoppel to bar this appeal."  He cites *Heins Implement Co. v. Mo. Highway & Transp. Comm'n*, 859 S.W.2d 681, 684-85 (Mo. banc 1993), *abrogated on other grounds by Southers v. City of Farmington*, 263 S.W.3d 603, 614 n.13

(Mo. banc 2008), which states that "[r]es judicata is a separate and distinct affirmative defense that must be specifically pleaded," and he cites Rules 55.08, 55.27, and 55.33 regarding pleadings and affirmative defenses.[13] Louie also cites *Consumer Fin. Corp. v. Reams*, 158 S.W.3d 792, 797-98 (Mo. App. W.D. 2005), in which the plaintiff was prohibited from offensively asserting collateral estoppel because the plaintiff did not plead the doctrine in its petition.

The defect in Louie's argument is that, absent an order by the trial court, Rules 55.08, 55.27(a), and 55.33 are not applicable "to proceedings in the probate division of the circuit court." Rule 41.01(a)(2) and (b); *see also In re Estate of Dodson*, 878 S.W.2d 513, 518 (Mo. App. S.D. 1994) (personal representatives were not required to plead an affirmative defense to a claim because the former version of Rule 41.01(b) excluded "Rule 55" from application to a probate claim). Louie does not claim that any such order was entered here, and when Amber's counsel objected at the hearing on the final settlement to Louie's attempt to relitigate the portions of the second trust case judgment "concerning the reformation and the no-contest clause[,]" the trial court sustained that objection. The argument made by Louie's counsel was that a purpose of the hearing was to permit the court an "opportunity to correct errors it made"; he did not object that Amber had waived any use of the second trust case judgment as an affirmative defense. *Cf. Stine v. Warford*, 18 S.W.3d 601, 605 (Mo. App. W.D. 2000) (a failure to timely assert affirmative defenses of collateral estoppel and res judicata was excused where the petitioner did not preserve an objection to the use of these defenses).

---

[13] *Heins* addressed res judicata as also being "referred to as claim preclusion." *Id.* at 684 n.1. For a comparison of claim preclusion and issue preclusion, *see Sexton*, 152 S.W.3d at 273 n.3.

However, the assertions in points V and VI that Amber's expense reimbursement claim and her "claim" for the POD balance violated the Trust's no-contest clause were *not* adjudicated in the second trust case.[14] But Point VI's claim that Amber violated the Trust's no-contest clause in "seeking distribution" of the POD balance is not preserved for review because, as Respondents suggest, it was not raised in the final settlement objections.[15] "Absent some constitutional imperative not present here . . . it simply is not the role of the court of appeals or [the Supreme] Court [of Missouri] to grant relief on arguments that were not presented to or decided by the trial court." ***Barkley v. McKeever Enters., Inc.***, 456 S.W.3d 829, 839 (Mo. banc 2015).

---

[14] The fifth and sixth points do not specifically assert error based upon violation of the Will's no-contest clause. Point V states:

> The trial court erred in denying [Louie]'s Motion to Invoke the [Will's no-contest clause] regarding the $46,288.72 claim filed and made by [Amber] in [the Estate case] and thereafter in overruling [Louie]'s related Objections to [the final distribution] because the filing and making of said claim by [Amber] violated the Trust's [no-contest clause] in that, the Trust's [no-contest clause], *inter alia*, provided that "[I]f any beneficiary of this Trust * * * files any action or makes any claim seeking distribution to him or her of an amount larger than what is provided for herein, then the Trustees are directed to distribute nothing to said * * * claiming beneficiary and that person shall receive nothing from this Trust * * * nor anything from [Rosetta]'s estates" and by filing and making said $46,288.72 claim, [Amber] was seeking distribution to her of an amount $46,288.72 larger than what the Trust provided for her.

Point VI states:

> The trial court erred in overruling [Louie]'s Objections to [the final distribution] seeking to invoke the [Will's no-contest clause] regarding the POD claim made by [Amber] for the $31,268.42 balance of 4-K Farms account because by making said claim, [Amber] violated the Trust's [no-contest clause] in that, the Trust's [no-contest clause], *inter alia*, provided that "[I]f any beneficiary of this Trust * * * makes any claim seeking distribution to him or her of an amount larger than what is provided for herein, then the Trustees are directed to distribute nothing to said * * * claiming beneficiary and that person shall receive nothing from this Trust * * * nor anything from [Rosetta]'s estates" and by making said $31,268.42 POD claim, [Amber] was seeking distribution to her of an amount $31,268.42 larger than what the Trust provided for her.

As a result, we do not consider whether the challenged rulings were erroneous based upon the Will's no contest clause. *See **Manzella v. Dir. of Revenue***, 363 S.W.3d 393, 395 (Mo. App. E.D. 2012) ("[t]his court reviews only those errors that are asserted in an appellant's point relied on").

[15] Louie also failed to raise this claim in the no-contest motion, and his reply brief does not attempt to rebut Respondents' contention that Louie failed to preserve Point VI for our review.

Even assuming, *arguendo,* that the Trust's no-contest clause is relevant to the administration of the Will, the clause was not violated when Amber presented the expense reimbursement claim -- the focus of Point V. A no-contest clause will "be enforced where it is clear that the trustor (or testator) intended that the conduct in question should forfeit a beneficiary's interest under the indenture (or will)." *Cox v. Fisher*, 322 S.W.2d 910, 914 (Mo. 1959). But "Missouri courts strictly construe no-contest, or *in terrorem*, clauses in wills and trusts[.]" *Labantschnig v. Bohlmann*, 439 S.W.3d 269, 273 (Mo. App. E.D. 2014). *Cf. Chaney v. Cooper*, 954 S.W.2d 510, 519 (Mo. App. W.D. 1997) (an objection to the probate of a will based on the controlling effect of a second person's will was not expressly prohibited by an *in terrorem* clause's language concerning a contest or attack against the first person's will).

Here, the Trust's no-contest clause does not penalize anything other than a contest of the Trust itself, its provisions, or an "action or . . . claim seeking distribution . . . of an amount larger than what is provided for [in the Trust.]" The Trust's no-contest clause gives no indication that a distribution is anything other than a distribution from the Trust estate, and Louie cites no provision of the Trust that defines "distribution" in a different way. Rather, he argues in his reply brief that "the use of the phrase 'files any action or makes any claim seeking distribution of an amount larger than what is provided for herein' means that Rosetta intended [that] the beneficiaries receive only what her trust provided for them – and nothing else – including 'anything from [Rosetta]'s estates[.]'" He cites no authority for this proposition, and he fails to square it with the Will's separate bequest of "tangible personal property[,]" which makes it clear that there would be a devise of property apart from what was distributed from the Trust. Louie also cites no authority for the proposition that a

16

forfeiture of the POD account as a part of "[Rosetta]'s estates" was intended as a penalty for enforcing the beneficiary designation of the POD account itself.

Amber's "claims" to the POD account did not seek a "distribution." A "pay-on-death" account is a valid form of account permitting a bank to agree to pay the account to a person other than the individual named on the account upon the death of the first person. Section 362.471.1 and 5. "At the death of all of the first named persons [on the account], the account *shall* become the property of the person or persons named as the 'pay-on-death' person or persons." Section 362.471.2 (emphasis added). Thus, a pay-on-death account is "a transfer of property taking effect upon the death of the owner, pursuant to a beneficiary designation[,]" section 461.005(7) RSMo Cum. Supp. 2013; it is a nontestamentary, nonprobate transfer of property. *Id.*; *see also* sections 362.471.5 and 461.001. In other words, even if Amber had to prove to the bank that Rosetta had died, ownership of the POD account passed from Rosetta to Amber by operation of law, and that transfer did not constitute a distribution from the Trust or a challenge to the Trust's no-contest clause. *See Cook v. Barnard*, 100 S.W.3d 924, 928 (Mo. App. W.D. 2003) (bank accounts/certificates of deposit that were jointly owned or payable on death passed to the joint owner/beneficiary "by operation of law").

Louie's first six points are denied.

*Point VII – Inventory of the POD Account*

Louie contends in Point VII that the trial court erred in overruling his final settlement objections based on section 473.233 because the POD "account was either the property owned by [Rosetta] or property possessed by [Rosetta] at the time of her death and [Amber] failed to inventory" it. Section 473.233 provides, *inter alia*:

17

1. Within thirty days after letters are granted, unless a longer time is granted by the court, the personal representative shall make and return an inventory and appraisement, in one written instrument, of all of the property of the decedent, including exempt property, which comes to his possession or knowledge, a statement of all encumbrances, liens, and other charges on any item, and all other property possessed by decedent at the time of his death.

This section further directs the personal representative to classify the property of the decedent, and bank accounts are one of the designated classification types. Section 473.233(1) and (5). The final classification provision states: "All property possessed but not owned by the decedent at his death shall be listed in the inventory, but separately from other property, together with a statement as to the knowledge of the personal representative as to its ownership." Section 473.233(7).

Louie's arguments ignore section 362.471.2, which as discussed in our analysis of Point V, provides that "[a]t the death of" the person or persons first named on the bank account, "the account shall become the property of the person or persons named as the 'pay-on-death' person or persons." Section 362.471.2. *See also*, *Cook*, 100 S.W.3d at 927-28 (reversing a personal representative's removal under section 461.300, stating that the personal representative's "decision not to inventory the non-probate assets was not a grounds for removal" and observing the non-probate assets were not the "decedent's at his death").

Louie argues that the analysis of section 473.233.1 in *Cook* "is merely *dicta*" because, as he reads the case, the issue in *Cook* "was whether the [personal representative] had a duty under [section] 461.300 – not [section] 473.233 – to inventory assets." The assets at issue were certificates of deposit jointly owned by the decedent and the personal representative or were in the decedent's name "with a payable-on-death designation in favor

of [the personal representative,]" along with real estate owned by these two men "as joint tenants with rights of survivorship." *Id.* at 926. The *Cook* opinion stated "[t]he sole issue here is whether as a matter of law the language for removal under Section 473.140, 'incapable or unsuitable to execute the trust reposed in him[,]' is satisfied when the personal representative declines to include jointly held non-probate assets in the inventory in order to satisfy tort claims." *Id.* at 927. The tort claimants argued that the failure to inventory the real estate and non-probate assets made the personal representative "'incapable or unsuitable' . . . supposedly, under Section 461.300(1)[.]" *Id.* The court in *Cook* found no section 461.300 requirement to inventory non-probate assets, and it pointed out that section 473.233(1), "[t]he inventory statute[,]" also imposed no such requirement. *Id.* at 927, 928-29. Because the *Cook* analysis of section 473.233 was necessary to determine whether removal was appropriate under section 473.140, Louie is incorrect in characterizing it as *dicta*.

Louie also maintains that *Cook* conflicts with *In re Estate of Foster*, 878 S.W.2d 896 (Mo. App. E.D. 1984). The *Foster* opinion addressed the need to inventory a one-third interest in a partnership (found to be held separately by the decedent *instead* of with her husband's interest as "an undivided two-thirds interest in" the partnership), and it found that the failure to inventory this separate personal property owned by the decedent was one reason warranting removal of the personal representative. *Id.* at 898. *Foster* is not in conflict with *Cook*. The two cases simply address different types of ownership interests that pass in different ways, and the ownership interest here is more like the ownership of the non-probate assets addressed in *Cook*. *See* 100 S.W.3d at 926.

Finally, Louie argues that "[a] decedent who exercises some dominion over property is inferentially in possession thereof[,]" citing, only generally, *In re Schell's Estate*, 390 S.W.2d 618 (Mo. App. Spfld.D. 1965). *Schell's Estate* addressed whether particular real estate was in the decedent's possession at his death because he "physically occupied it and exercised some dominion over it by" farming it and paying property taxes on it. *Id.* at 621. The opinion does not discuss whether the existence of a joint tenant with right of survivorship would have extinguished the decedent's interest at his death. The finding by the trial court was that the decedent had previously conveyed the property at issue by two warranty deeds, but the deeds had not been delivered to the grantees and were not recorded until after the decedent's death. *Id.* at 619. The reviewing court found that "[t]his is at least a species of possession" such that the realty should have been inventoried, but it also pointed out that it did "not undertake to define precisely and for all purposes the meaning of the word 'possessed' as it appears in subpar. (7) of par. 1 of Section 473.233[.]" *Id.* at 621. Louie cites no case holding that a pay-on-death account is "property possessed but not owned by the decedent at his death[,]" and none of his points challenge the validity of the POD account's designation of Amber as the owner at Rosetta's death.

Amber was not obligated to inventory the POD account that passed to her by operation of law at Rosetta's death. Point VII is denied.

*Point VIII – The Expense Reimbursement Claim*

Louie contends in his eighth point that the trial court erred in overruling the final settlement objections because:

> (1) [the expense reimbursement claim was] not in existence at the time of [Rosetta]'s death; (2) there was no agreement between [Amber] and [Rosetta] that [Amber] would be reimbursed for [Rosetta]'s debts paid from the [POD account]; (3) [t]he funeral bill was paid from the [POD account] which was

20

property of the Estate; (4) the household/farm expenses paid by [Amber] after [Rosetta]'s death constituted the operation of [Rosetta]'s farm business without a court order; and (5) [Amber] was seeking reimbursement for debts of a [d]ecedent which she paid as a volunteer without following the claims procedure of the probate code.[16]

**"Claims"** under the probate code[17] "include liabilities of the decedent which survive whether arising in contract, tort or otherwise, funeral expenses, the expense of a tombstone, and costs and expenses of administration[.]" Section 472.010(3). A claim may be paid if it is "duly filed and allowed by the court[,]" section 473.403.1, *or*, unless the claim is that of the personal representative herself, "any claim may be paid by the personal representative, without allowance thereof by the court, and credit may be had therefor in his settlement, provided the same is either paid or filed within the time prescribed by section 473.360[.]" Section 473.403.2.

A personal representative may file his own "claim against estate assets, [but] he may not pass upon allowance and payment. Instead, the personal representative must file the claim and either file the written consent to the claim by those adversely affected or secure approval by an administrator ad litem." *Adams v. Braggs*, 739 S.W.2d 744, 745 (Mo. App. W.D. 1987); *see also* section 473.423. When a claim against an estate is challenged, the "personal representative bears the burden 'to prove that the estate was liable on the claim for the amount so paid.'" *In re Estate of Weddle*, 84 S.W.3d 144, 146 (Mo. App. W.D. 2002) (quoting section 473.403.2). When a person pays the liabilities of a decedent from her own funds, that person "succeed[s] to the rights of" those who were paid; the person is then "under the same obligations to perfect the claim as any other creditor." *Adams*, 739 S.W.2d

---

[16] Louie includes a footnote directing us to Point VI of his first Estate appeal, claiming that statutory provisions regarding the administrator ad litem's appearance and management of the expense reimbursement claim were not followed. We decline review of any such issues because they are not presented in a point relied on in this appeal. *See Manzella*, 363 S.W.3d at 395.

[17] The **"probate code"** consists of chapters 472-475 of Missouri's statutes. Section 472.010(5).

at 746.  The trial court is to sustain exceptions to the claim insofar as it "determines that the estate was not liable for any part of the amount paid[.]"  *Weddle*, 84 S.W.3d at 146.

Here, the trial court took judicial notice of the expense reimbursement claim asserted in the January 2013 and January 2015 hearings in the Estate case.  Amber testified in the January 2015 hearing that she believed the bills in her expense reimbursement claim to be the "obligations of" Rosetta.  The expense reimbursement claim incorporated photocopies of checkbook register pages with handwritten entries, along with receipts, bills, and statements from third parties (collectively "statements") for some, but not all, of the checks, and additional evidence was presented in subsequent hearings.  The payees were a nursing care facility, a health clinic, a funeral home, three people providing services as "hired hands" or home help, a mowing service, utility providers, telephone/internet providers, veterinarians, a gasoline vendor, a tire company, a hardware store, automotive vendors, farm vendors, and "D-Carr Fastrip[.]"[18]

All but two of the statements identified the customer or subject as Rosetta, Gary, 4-K Farms, or some other name that could be reasonably understood to mean one of these three entities; the two exceptions listed no customer name at all.  The Trust was not identified as the customer or subject on any of the statements.[19]  Louie agreed in his testimony during the January 2015 hearing that bills for Rosetta's funeral, the nursing care facility, one farm vendor, and two telephone/internet providers were for the care of Rosetta or obligations of the Estate.  Louie also acknowledged that bills from three utility companies, the tire vendor, another veterinarian, the gas vendor, one automotive vendor and two other farm vendors were for things provided before Rosetta's death.  Thus, the payments to the suppliers were

---

[18] No documentation other than the checkbook register was included with the expense reimbursement claim regarding payments to the three hired hands, home help, and the mowing service.
[19] Statements from one veterinarian and one automotive vendor did not indicate a customer name.

22

linked to Rosetta based upon Amber's testimony; some testimony from Louie; the dates or services referenced on the statements or the check register; or a combination of these sources.

Amber testified that at the time of Rosetta's death, the Estate did not have sufficient funds in its account to pay the bills included in the expense reimbursement claim. There were, however, sufficient funds in the POD account to pay the bills, and Amber believed that Rosetta would have wanted those bills paid as "[s]he was a stickler for paying bills on time." While Louie is correct that Amber paid the items comprising the expense reimbursement claim after Rosetta's death, the trial court could find that she did so in order to pay obligations of Rosetta that could not be paid from the Estate at the time of Rosetta's death. Upon paying them, Amber succeeded to the rights of the vendors she paid. *See Adams*, 739 S.W.2d at 746. We therefore reject Louie's argument that the expense reimbursement claim "arose" after Rosetta's death insofar as it suggests that the items were not Rosetta's expenses.

We also reject his argument -- unsupported by legal authority -- that "Rosetta had no 'liability *** [sic] arising in contract' with Amber." Louie maintains that Amber admitted "that she did not have an agreement with [Rosetta] to be reimbursed for checks written out of [the POD] account after [Rosetta] passed." We fail to see the legal relevance of such testimony. The trial court apparently credited Amber's testimony that the bills she paid comprising the expense reimbursement claim were Rosetta's, and that testimony constituted substantial evidence that Amber succeeded to the position of the creditors she paid. And for the reasons stated in our analysis of points V and VII, we reject Louie's assertion that the POD account was the property of Rosetta for purposes of paying her funeral bill.

23

Louie's contentions that the trial court erred in overruling the final settlement objections because Amber operated Rosetta's "farm business without a court order" and the household and farm were assets of the Trust are also without merit. Again, the expense reimbursement claim was for obligations Rosetta incurred while still alive; they did not arise after her death, and none of the bills indicated that they were obligations incurred by the Trust instead of by Rosetta in her personal capacity. Amber testified that all farm expenses were paid out of the POD account, and Louie testified that his understanding was that Rosetta "continue[d] to run the income and expenses of the farm out of her personal account" after the Trust was created.[20]

The fifth sub-part of Point VIII, contending that Amber paid Rosetta's debts "as a volunteer without following the claims procedure of the probate code," is not supported by Louie's general citations to "the function of the probate court . . . to adjudicate and allow claims[,]" *Hess v. Sandner*, 198 S.W. 1125, 1126 (Mo. App. K.C.D. 1917), and the duty of the probate court "to pass on any claim presented for allowance against a decedent's estate[.]" *Calvin F. Feutz Funeral Home, Inc. v. Werner's Estate*, 417 S.W.2d 25, 27 (Mo. App. St.L.D. 1967). Had there been money in the Estate's account, Amber could have paid the vendors represented in the expense reimbursement claim within the time permitted under section 473.360 without allowance by the trial court in advance, although she would have had to prove the Estate's liability for the expense upon Louie's exception to the final distribution. Section 473.403.2. When Amber instead succeeded to the vendors' positions by paying the bills within a month of Rosetta's death with her own money, then filing the expense reimbursement claim within two months of the issuance of the letters testamentary

---

[20] Given our finding that Louie has not demonstrated that the expense reimbursement claim was in support of the Trust instead of Rosetta, we need not decide whether the "SECOND" part of the Trust would have alternatively supported payment of the expense reimbursement claim from Trust property.

24

and presenting evidence supporting the claim at the hearing on the final settlement objections, she followed the appropriate claims procedure. Point VIII is denied.

*Point IX – The Appellate Attorney Fees Allowance*

Finally, Louie insists that the trial court erred in entering the final distribution because the appellate attorney fees allowance did not benefit the "Estate as a whole . . . in that the appeal only involved a dispute between conflicting claimants to [Rosetta's Estate] and [the] Trust." His brief alleges that "[t]he record in [the first Estate appeal] conclusively establishes that [Amber] in her capacity as [p]ersonal [r]epresentative had no interest in the outcome of [the first Estate appeal.]"

In the appellate attorney fees order, the trial court found that the attorneys had "rendered legal services and incurred expenses in the Appeals [sic] filed against the [E]state and should be compensated for such services." The order did not restrict the payment of attorney fees to those earned in representing any specific party over another, and it did not cite a particular statute. The docket entry accompanying the order stated: "After carefully reviewing the Personal Representative's Petition For Payment of Atto[rn]eys' Fees and Billing Statements together with the Suggestions in opposition thereto as well as the applicable case law, the Court approves the Petition and enters the order which has been signed and filed herein."

At the hearing on the final settlement objections, Louie testified that the first Estate appeal involved his challenge to the Will's no-contest clause and the expense reimbursement claim. Following Louie's offer of exhibits that included the "Petition & Order/Payment for Attorney Fees" and "Appeal Briefs, Appendix, Order & Mandate" from the first Estate appeal, the trial court took judicial notice of all these materials, including the itemization of

25

the appellate attorney fees incorporated into the petition. The final distribution is based upon the figures contained in the final settlement, which included the appellate attorney fees allowance as a debit.

Attorney fees may be awarded as an expense of administration in a probate matter. *Campbell v. Campbell*, 929 S.W.2d 757, 760, 761 (Mo. App. W.D. 1996) (attorney fees affirmed for an administrator ad litem), and "[t]he determination of appropriate expenses of administration rests within the sound discretion of the [trial] court." *In re Estate of Veselich v. Nw. Nat'l. Cas. Co.*, 760 S.W.2d 564, 570 (Mo. App. W.D. 1988). "The trial court is considered an expert on attorney's fees, including fees for services on appeal[.]" *Klinkerfuss v. Cronin*, 289 S.W.3d 607, 613 (Mo. App. E.D. 2009).

"[T]he general rule for attorney fees is that they are recoverable only when authorized by statute or contract, when a *court of equity* finds it necessary to award them in order to balance benefits, or when they are incurred because of involvement in collateral litigation." *In re Estate of Murray*, 682 S.W.2d 857, 858 (Mo. App. W.D. 1984). Section 473.153.3 provides for the compensation of "[a]ttorneys performing services for the estate at the instance of the personal representative" based upon a schedule provided in subsection 1 of the statute, but it also provides that "additional compensation" is allowable where "reasonable compensation" exceeds what the schedule provides.

Awards of attorney fees on behalf of beneficiaries in probate matters have been upheld under the equitable power of the trial court. *See In re Estate of Chrisman*, 723 S.W.2d 484, 486-87 (Mo. App. E.D. 1986) (the trial "court abused its discretion in denying attorney fees and expenses to" a contingent remainderman under the "'equitable balancing of benefits'" principle because his action substantially benefitted the estate) (quoting

*Murray*, 682 S.W.2d at 858, where attorney fees were affirmed for a residuary heir based on a successful effort to remove a personal representative). "As a general principle, the allowance of attorney fees under the criteria of 'equitable balancing of benefits' is governed by the rule in *Dugger v. Welp*, 646 S.W.2d 907, 909 (Mo.App.1983), that 'very unusual circumstances' must be shown." *Murray*, 682 S.W.2d at 858. "'Very unusual circumstances,' as it relates to the reimbursement of attorney's fees, has been interpreted to mean an unusual type of case or unusually complicated litigation. 'Balancing of benefits' under 'very unusual circumstances' has been confined to very limited fact situations." *In re Morrison*, 987 S.W.2d 475, 478 (Mo. App. S.D. 1999) (citation omitted). "While there is scant authority, Missouri seems to follow the rule that expenses incurred by a beneficiary of an estate, rather than the personal representative, must be shown to be beneficial to the estate as a whole rather than to just individuals interested therein." *Murray*, 682 S.W.2d at 858.

Thus, simply because the attorney fees allowance may have benefited Respondents, individually, in addition to Amber as personal representative, does not necessarily mean that the trial court abused its discretion in allowing an award of such fees here. The appellate attorney fees allowance was not limited expressly to an application of section 473.153.3. Further, as Respondents point out, the cases Louie cites in support of Point IX are not dispositive,[21] and we are to affirm the final settlement order based upon any reasonable theory that is supported by the evidence. *See Hock*, 322 S.W.3d at 579.

---

[21] *In re Estate of Broadhurst*, 737 S.W.2d 504, 507 (Mo. App. S.D. 1987), involved a finding that a personal representative was not shown aggrieved so as to properly appeal a widow's application for exempt property and election to take against the will. The opinion did not involve the allowance of attorney fees. In *St. Louis Union Trust Co. v. Conant*, 499 S.W.2d 761, 769 (Mo. 1973), a trustee was denied the payment of attorney fees from the trust for legal advice to the trustee regarding his own liability if the trust entered into a settlement of a will contest suit and for the trustee's filing of a declaratory judgment action related to the will contest suit. As pointed out in another trust case, "[i]n *Conant*, the attorney's services related *solely* to the trustee's potential liability in the event the trustee entered into and participated in a proposed plan to partially destroy the trust." *Klinkerfuss*, 199 S.W.3d at 845 (emphasis added). Respondents are correct that an opinion Louie

In terms of a basis in equity for the award, the trial court could have found that there were very unusual circumstances complicating the administration of the Estate case. Louie entered the first trust case, but he raised no argument that the order sought by Amber with the agreement of Cynthia would have violated any part of the Trust or the no-contest clauses. In the second trust case, Louie litigated his counterclaims that Respondents violated both no-contest clauses in each of the trust cases, and Respondents prevailed. Louie also litigated the no-contest clauses, along with the expense reimbursement claim, in the first Estate case.

Respondents prevailed in the first Estate appeal, but Louie's unsuccessful attempt to bring an interlocutory appeal resulted in the accrual of attorney fees for the respondents in that appeal. Louie named Amber in both her individual capacity and in her personal

quotes, ***Tracy v. Martin***, 239 S.W.2d 567 (Mo. App. St.L.D. 1951) (reversing award of a guardian ad litem fee), was superseded by ***Tracy v. Martin***, 249 S.W.2d 321, 324 (Mo. banc 1952) (guardian ad litem fee affirmed). But of greater significance here is that the analogy Louie cites from the former opinion for denying attorney fees -- "the efforts of counsel are not for the benefit of the estate as a whole, but are exerted *solely* for the selfish benefit of the party litigant" -- does not apply here. ***Tracy***, 239 S.W.2d at 570 (emphasis added). Finally, as Respondents suggest, Louie misses the heart of the following passage he quotes from ***In re Thomasson's Estate***, 171 S.W.2d 553, 561, 564 (Mo. banc 1943) (affirming the circuit court's award of attorney fees for prior administratrices of an estate) (citations and footnote omitted, emphasis added):

> With respect to the assets that come into his custody or control by virtue of his office an executor or administrator is trustee for all parties interested, the deceased, the beneficiaries, and creditors. So, likewise, the test as to the services rendered by the attorney for such 'trustee,' is whether they are beneficial to the whole estate rather than some special interest. This is true even where the attorney is directly employed by the administrator. On this theory it is said the general rule is, that while no allowance may be made out of an estate for legal services rendered for the sole benefit of particular heirs or beneficiaries, yet such allowance may be made in so far as the attorney employed by such heirs is recognized as attorney for the whole estate and his services are accepted and beneficial thereto.

> *This harmonizes with and is analogous to the doctrine . . . that when an administrator employs an attorney to represent the estate, the contract has a double aspect. The administrator is personally bound thereby, but the estate also is bound in so far as the services rendered to it are necessary or beneficial and the charges reasonable . . . . [A]n administrator's attorney does not forfeit his right to compensation from the estate for services rendered to it, merely because he also represented the administrator in presenting the latter's personal claim against the estate.* So on this assignment we conclude the legal services rendered by respondents to the Thomasson estate during the intestate administration were not referable to the relatives' contract [with 35 relatives executed before the estate was opened], but to the administratrices' contract[.]

28

representative roles, but he now argues that she was not a "stakeholder" as personal representative. He does not explain why Amber was not under the general duty imposed by section 473.270 to "defend all actions brought against [her,]" especially since this was not a situation in which she was certain to lose or otherwise harm the Estate in defending against Louie's claims on appeal. *Cf.* **Veselich**, 760 S.W.2d at 569 ("[t]he personal representative is not obligated by virtue of [section 473.270] to defend an action when in the reasonable judgment of the personal representative and the court defense of the action is not in the best interest of the estate"). "It has long been established that the personal representative serves in a fiduciary capacity. It is the duty of the personal representative to look after the interests of the estate and to act for and on behalf of all persons who have an interest in the estate." **Id.**

Now, Louie unsuccessfully presses the previously litigated issues yet again in the form of his final settlement objections in this second appeal. Of course, successfully defending a claim does not in itself establish very unusual circumstances equitably warranting an award of attorney fees, but the repeated litigation and required defense of the same issues in the same and in separate cases certainly complicated the resolution of the Estate case.

In terms of balancing the benefits in this case, the "tangible personal property[,]" including proceeds from an auction of some of this property, was divided equally between Louie and Respondents, with the remainder of the Estate to be devised to the Trust. And to the extent that the sum could be distributed from the Trust, Louie and Respondents are again equal beneficiaries of the Trust, with the exception of a specified percentage to the trustee for running the farm and two specific grants of real estate. The effect of the appellate

29

attorney fees allowance, then, is that Louie and Respondents each share the burden of the appellate attorney fees in equal parts. Under the unique circumstances of this case, we cannot say that the trial court abused its discretion in effectively dividing the appellate attorney fees among Louie and Respondents equally.[22]

Point IX is also denied, and the final distribution is affirmed.

DON E. BURRELL, P.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. - CONCURS

GARY W. LYNCH, J. - CONCURS

---

[22] Respondents have not filed a motion with this court seeking attorney fees in connection with this appeal. Louie filed a motion with this court seeking his attorney fees on appeal and it was taken with the case. The motion cites this district's Special Rule 14, which allows a party to seek appellate attorney fees based on "contract, statute or otherwise[.]" Louie provides no further explanation of why such an award would be appropriate here, and we deny the motion.